UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

A.B.,                                           :     Case No. 2:17-cv-05840-JS-GRB
                                                :
                              Plaintiff,         :
                                                :
          -against-                             :
                                                :     **NOTICE OF MOTION**
C.D.,                                           :
                                                :
                              Defendant.         :

---------------------------------------------------------------X

    PLEASE TAKE NOTICE that, upon the annexed Declaration of Cheryl L. Davis,

dated October 20, 2017, and the exhibits thereto, and upon the accompanying Memorandum of

Law in Support of Motion to Consolidate and to Seal Record or, in the Alternative, to Continue

Use of Party Pseudonyms, and upon all prior pleadings and proceedings herein, Plaintiff A.B.

shall move this Court, before the Honorable Joanna Seybert, U.S.D.J., at the United States

Courthouse located at 100 Federal Plaza, Central Islip, New York, 11722 on October 31, 2017

or as soon thereafter as counsel may be heard, for an order pursuant to Rule 42(a) of the Federal

Rules of Civil Procedure granting consolidation of this removed action with two related actions

pending in this Court, and sealing the record or, in the alternative, authorizing continued use of

party pseudonyms, and for such other and further relief as the Court deems just and proper.

Dated: New York, New York
   October 20, 2017

          Respectfully submitted,

          MENAKER & HERRMANN LLP

          By: _____
            Cheryl L. Davis

          *Attorneys for Plaintiff A.B.*
          10 East 40th Street
          New York, New York 10016
          Tel.: (212) 545-1900

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
A.B.,                                            :    Case No. 2:17-cv-05840-JS-GRB
                                                 :
                                    Plaintiff,   :
                    -against-                    :
                                                 :
C.D.,                                            :
                                                 :
                                    Defendant.   :
                                                 :
------------------------------------------------------------X

## DECLARATION OF CHERYL L. DAVIS AND CERTIFICATION PURSUANT TO LOCAL CIVIL RULES 26.4 AND F.R.C.P. 37(a)(1)

I, CHERYL L. DAVIS, declare subject to penalties of perjury pursuant to 28 U.S.C. §1746, as follows:

1.      I am admitted to practice before the Bar of this Court and am a Member of the law firm Menaker & Herrmann LLP, attorneys for the plaintiff "A.B.".

2.      I submit this declaration in support of plaintiff's motion for an order (a) consolidating this removed action with two related actions pending in this Court, and (b) sealing the record or, in the alternative, authorizing continued use of party pseudonyms in the interest of justice.  A copy of the complaint is attached hereto as **Exhibit A**.

3.      In the instant action, plaintiff seeks redress for certain defamatory statements made by defendant, who is a college student at Hofstra University ("Hofstra") a private university at which plaintiff was defendant's coach.

4.      The complaint alleges that defendant approached plaintiff in the parking lot near the Hofstra tennis courts in late April 2016 and asked whether her 45% athletic scholarship would be increased to a full scholarship in the coming academic year.  When

plaintiff could not assist her in achieving this goal, defendant's father called plaintiff from Canada and personally threatened him. Defendant and her parents subsequently engaged an attorney, who sent a letter to the college falsely accusing plaintiff of engaging in quid pro quo sexual harassment, i.e., requiring that she engage in sexual relations in exchange for an increased scholarship, and other extreme, lurid charges.  The letter sought financial benefits for C.D. and implied that plaintiff should be fired, as conditions to C.D.'s not pursuing her charges in court. The charges are untrue.

5.      The college terminated Plaintiff's employment at the start of the school year, in a manner that greatly hampered his ability to obtain subsequent employment. Upon information and belief, this action was taken because of defendant's false claims that plaintiff had sexually harassed her.

6.      Upon information and belief, the college did not complete a formal investigation of C.D.'s charges before terminating plaintiff's employment and, contrary to its published policies, did not issue an investigation report to which plaintiff could respond. The complaint alleges that plaintiff's termination was part of a settlement between defendant and the college; discovery is needed to determine the specific terms of any such settlement. Hofstra's decision makers, all women, did not properly investigate the claim and failed even to follow Hofstra's basic procedures for dealing with harassment accusations. Instead, they accepted at face value the false assertions of the tennis player because she is female, and directed the Athletics Department to terminate plaintiff's employment because of his gender (male).

7.      Plaintiff thereafter timely brought a Charge of Discrimination before the U.S. Equal Employment Opportunities Commission alleging sex discrimination by Hofstra under Title VII of the Civil Rights Act, 42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C.

12117, 42 U.S.C. 2000ff-6. The E.E.O.C. issued a Right to Sue Letter on May 30, 2017, **Exhibit B** hereto. Meanwhile, plaintiff brought the present action against C.D., the student who had defamed him. Plaintiff made a preliminary request in the Eastern District for permission to use pseudonyms, which was denied. He then filed in New York State Supreme Court, Queens County, where anonymous treatment is permitted upon filing. Defendant removed the action to this Court.

8.   Plaintiff brought a separate action against Hofstra, the Dismissal case, in Queens County after he received his Right to Sue Letter. Hofstra also removed that action. The case (*A.B. v. Hofstra University*, 2:2017-cv-05562, the "Dismissal case") is pending before Judge Feuerstein. The complaint in that action is attached hereto as **Exhibit C**. Plaintiff is filing a similar motion in the Dismissal case requesting consolidation and the continued use of pseudonyms to identify the parties; a copy of the letter motion therein (per court rules) is attached hereto as **Exhibit D**.

9.   The Hofstra removal notice in the Dismissal case included a reference to a third action involving the same set of facts. Plaintiff's investigation of this disclosed that, unknown to him, C.D. had previously brought her own action against Hofstra back in January 2017 (*C.D. v. Hofstra University*, 2:17-cv-00179, the "C.D. case"). The Civil Cover Sheet, on which the related case was listed, is attached hereto as **Exhibit E**. A redacted copy of the complaint in the C.D. case is attached hereto as **Exhibit F**. Judge Hurley, to whom that case was assigned, had on April 6, 2017 granted C.D.'s motion to proceed under the pseudonym "C.D.." The order and redacted related motion papers are attached hereto as **Exhibit G**.

10.　　Counsel for C.D., in removing the instant case to the Eastern District of New York also listed the C.D. case as a related case. *See* Docket Entry No. 1, page 30 (**Exhibit H** hereto).

11.　　We have reached out to counsel for defendant prior to filing this motion to meet and confer pursuant to Local Civil Rules 26.4 and F.R.C.P. 37(a)(1). Counsel stated that defendant consents to consolidating the three cases and that defendant has not yet decided whether it will consent to or oppose the motion to seal or proceed pseudonymously.

12.　　We have also reached out to counsel for Hofstra. Counsel for Hofstra is not consenting to either plaintiff's motion to consolidate or plaintiff's motion to seal or continue using pseudonyms.

13.　　I declare under penalty of perjury that the foregoing is true and correct pursuant to Title 28, U.S. Code § 1746.

Dated:　New York, New York
　　　　October 20, 2017

　　　　　　　　　　　　　　　　　　　CHERYL L. DAVIS

# Exhibit A to Davis Declaration

FILED: QUEENS COUNTY CLERK 06/01/2017 05:12 PM     INDEX NO. 707527/2017
NYSCEF DOC. NO. 2                                          RECEIVED NYSCEF: 06/01/2017

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF QUEENS
-----------------------------------------------------------------------X
                                                          :
A. B., an individual,                                     :     Index No.
                                                          :
                                    Plaintiff,            :
                                                          :
                        -against-                         :
                                                          :     **COMPLAINT**
C. D., an individual,                                     :
                                                          :
                                    Defendant.            :
                                                          :
-----------------------------------------------------------------------X

       Plaintiff A. B. ("Plaintiff"), by his attorneys Menaker & Herrmann LLP, for his complaint against Defendant C. D. ("Defendant"), alleges as follows:

       1.     Plaintiff is an individual residing in the County of Queens, New York.

       2.     Upon information and belief, Defendant is an individual who is currently enrolled in Hofstra University in the County of Nassau, New York.

       3.     Upon information and belief, nonparty E.F. is a teammate of Defendant's on the Hofstra Women's Varsity Tennis Team who, upon information and belief, conspired with Defendant to further Defendant's malicious and mercenary objectives and committed a fraud as part of her shared scheme with Defendant, as described in paragraphs 56-58 below.

       4.     The complaint uses fictitious names for Plaintiff, Defendant, and the non-party co-conspirator to permit this action to proceed anonymously, at least at the initial stages of the proceedings, because the litigation involves matters that are highly sensitive and of a personal nature; identification poses a risk of retaliatory physical or mental harm to Plaintiff and his immediate family, since Defendant's father has already threatened harm to Plaintiff;

-1-

Case 2:17-cv-05560-RJS-GRB Document 10-1 Filed 10/30/17 Page 8 of 122 PageID #: 79

Defendant and the nonparty co-conspirator are college-age students, and Plaintiff wishes to minimize repercussions to them from this action prior to adjudication; the injury litigated against would be exacerbated as a result of disclosure of Plaintiff's identity; Defendant is not prejudiced by allowing Plaintiff to press his claims anonymously and benefits from being treated anonymously in the pleadings; the identities of Plaintiff Defendant and the nonparty co-conspirator have thus far been kept confidential (but are known to the parties, so discovery can proceed); there is very little public benefit to exposing the parties' actual names, and the public's interest in litigation generally is not furthered by requiring their identities to be disclosed.

## BACKGROUND FACTS

5.      On or about January 15, 2016, Hofstra University ("Hofstra") hired Plaintiff to be the Director of Tennis in the Department of Athletics (the "Department") and Head Coach of the Men's and Women's Varsity Tennis Teams. One of Plaintiff's responsibilities as Director of Tennis was to manage athletic scholarships for the Hofstra tennis programs.

6.      Upon information and belief, Hofstra's prior Director of Tennis had resigned prior to the commencement of the 2015-16 academic year.

7.      When Plaintiff started working at Hofstra in January 2016, he inherited the arrangements that the prior Director of Tennis had already put in place, which included the annual allocation of athletic scholarship funds to members of the tennis teams.

8.      In late April 2016, just before leaving for the season-ending conference tournament, Defendant, who was then a first-year foreign student on the Women's Varsity Tennis Team, approached Plaintiff in the parking lot near the Hofstra tennis courts and said she

-2-

wanted to check with him that her 45% athletic scholarship would be increased to a full schol-arship for the following school year, starting in the fall of 2016. Defendant claimed that this increase had been promised by the previous Director of Tennis.

9.      Plaintiff told Defendant that he knew nothing about this arrangement but said he would investigate.

10.     Plaintiff thereafter reviewed the Defendant's financial aid records and reported the conversation to his supervisor, Alyssa Morales-Kelly ("Morales-Kelly"), the sports administrator for tennis in the Department.

11.     Morales-Kelly confirmed that the Department had no record of a promise to increase Defendant's athletic scholarship.

12.     Shortly thereafter, Plaintiff followed up with Defendant, who said the prior Director of Tennis had promised this to her orally, and she admitted that the offer was not in writing anywhere.

13.     Plaintiff told Defendant he had no ability to increase her scholarship for the coming year but could offer her a full scholarship for her junior and senior years. She replied that she would inform her parents, and Plaintiff said they should feel free to call him with any questions.

14.     In early May 2016, Plaintiff received a call from Defendant's father, pre-sumably from his home in Ontario.   Upon information and belief, Defendant's father is a native of Russia and was a state-funded athlete there before immigrating to Israel and later Canada.

15.     Defendant's father shouted at Plaintiff on the phone for approximately a half hour. He accused Plaintiff of reneging on a commitment supposedly made by the prior

-3-

FILED: QUEENS COUNTY CLERK 06/01/2017 05:12 PM

NYSCEF DOC. NO. 2

INDEX NO. 707527/2017

RECEIVED NYSCEF: 06/01/2017

Director of Tennis and threatened that if Plaintiff did not guarantee Defendant a full scholarship, trouble would "come back to [him]".

16.    Plaintiff immediately reported the telephone call to Morales-Kelly, who told him to take no further action.

17.    In May 2016, Defendant visited Plaintiff's office and told him that her parents could no longer afford to send her to Hofstra. She stated that she would probably have to transfer to another school.

18.    Plaintiff told Defendant he was disappointed that her parents had reached this conclusion, and repeated his offer to grant her a full scholarship for her junior and senior years. She stated that she would have to check with her parents, but she did not make any subsequent response to this offer.

19.    In May 2016, the Hofstra Athletic Department administered year-end computer surveys in which the tennis teams were required to provide anonymous reviews of the tennis season and the coaching staff. These surveys were known to be viewed by administrators only.

20.    When Plaintiff met with Morales-Kelly to discuss these reviews in connection with his own end-of-semester review, Morales-Kelly mentioned no criticisms from any anonymous review. When Plaintiff asked her later if anyone had complained in the anonymous survey, she told him "No".

21.    In late May 2016, Defendant called Plaintiff to ask him for a "release" under NCAA rules that would permit her to transfer to another university and tennis program.

-4-

FILED: QUEENS COUNTY CLERK 06/01/2017 05:12 PM
NYSCEF DOC. NO. 2

INDEX NO. 707527/2017

RECEIVED NYSCEF: 06/01/2017

22.     Plaintiff then conferred with Morales-Kelly, who stated that she believed the request for the release was a ploy by Defendant to see if she could get more financial aid from Hofstra.

23.     After meeting with Morales-Kelly, Plaintiff told Defendant that he would provide the requested release, but that this meant that his offer of additional financial aid at Hofstra for her junior and senior years would then be off the table.

24.     Defendant subsequently texted Plaintiff on June 3, 2016 to ask what would happen to her financial aid if she came back to Hofstra after talking with other schools because her parents were "not understanding exactly what could happen."

25.     Plaintiff emailed Defendant on June 6, 2016 to verify what he had previously told her and also texted her the same information.

26.     On June 6, 2016, Defendant texted Plaintiff to say that she might stay at Hofstra for the fall semester while continuing to look for another school.

27.     On June 23, 2016, Defendant texted Plaintiff saying "Hi Coach, I'm coming back in the fall."

28.     On June 29, 2016, Defendant admitted to Plaintiff in a telephone call that "oh, I never really looked for another school."

29.     In late July 2016, Plaintiff was summoned to the office of the General Counsel for the University (the "July Meeting") along with Jeffrey Hathaway ("Hathaway"), the Vice President and Director of Athletics.

-5-

FILED: QUEENS COUNTY CLERK 06/01/2017 05:12 PM
NYSCEF DOC. NO. 2

INDEX NO. 707527/2017

RECEIVED NYSCEF: 06/01/2017

30.     At the July Meeting, a deputy general counsel named Jennifer Mone ("Mone"), while apparently reading from a document, asked Plaintiff questions about his methods of communication with members of the tennis program.

31.     When Plaintiff asked to see the document from which Mone was reading, Mone handed him a letter from Defendant's counsel dated July 22, 2016 (the "Letter") purporting to be a "[Defendant's] Title IX Complaint" (a redacted copy of the Letter is attached hereto as Ex. A.)

32.     In the Letter, Defendant claimed that she had been "subjected to unwanted and unwarranted sexual harassment by the new Hofstra tennis coach, [Plaintiff]." (Ex. A at p. 1). This statement was false.

33.     Defendant accused Plaintiff of having "a strange obsession with [Defendant's] menstrual cycle, and would repeatedly comment about when [Defendant] was getting her period." (*Id.*). This statement was false.

34.     Defendant claimed that "[t]hese comments made [Defendant] feel extremely uncomfortable, anxious and violated." (*Id.* at p. 2). Since no such comments were made, this statement was false.

35.     Defendant claimed that "[Plaintiff] was also very concerned with his female players' appearances, telling the players that when they are out in public they must 'dress nice' and must 'shave their legs'." (*Id.*). This statement was false.

36.     In fact, the only time Plaintiff commented about the players' appearances was around April 22, 2016, when both men's and women's teams were scheduled to attend dinner at a steakhouse during a weekend of competition. Plaintiff had told all the tennis players

-6-

FILED: QUEENS COUNTY CLERK 06/01/2017 05:12 PM INDEX NO. 707527/2017

NYSCEF DOC. NO. 2 RECEIVED NYSCEF: 06/01/2017

(male and female) not to wear their sweatsuits, but to clean up and dress appropriately for the occasion.

37. Defendant claimed that "[d]uring another tournament against Delaware, [Plaintiff] began to scream obscenities and verbal abuse at a female tennis player on the opposing team. [Plaintiff's] conduct towards this female player was so disturbing that the parent of the player called Hathaway to complain about [Plaintiff's] conduct." (*Id.*).

38. This allegation was completely untrue, and was in fact disputed by Hathaway himself during the meeting with Mone.

39. Defendant also claimed that Plaintiff's sending her a YouTube video entitled "Casually Explained: Is She Into You?", which was one of a series of satirical videos publicly posted by a YouTube subscriber named "Casually Explained", was "unquestionably inappropriate" and "clearly insinuating that [Plaintiff] would like to know if [Defendant] is 'into him'." (*Id.*). This claim of an insinuation was false. Plaintiff had sent the YouTube item following an informal chat with Defendant and several of her teammates about Canadian stereotypes.

40. Defendant claimed that "after [Defendant] did not respond to [Plaintiff's] advances, [Plaintiff] soon began to threaten [Defendant]." (*Id.*). This statement was false.

41. Defendant's attorney summed up and repeated these statements: "[Plaintiff] made numerous comments about [Defendant]'s period, including outright stating that he thought she was playing poorly at practice because of her period. He demanded that the women 'dress nice' and 'shave their legs', which constituted a clear attempt to force the female players into conforming to traditional gender stereotypes. [Plaintiff] made comments about the attractiveness of other female tennis players, and spewed various derogatory obscenities at opposing

-7-

FILED: QUEENS COUNTY CLERK 06/01/2017 05:12 PM INDEX NO. 707527/2017
NYSCEF DOC. NO. 2                                              RECEIVED NYSCEF: 06/01/2017

female players. Lastly, the video that [Plaintiff] sent to [Defendant] and the subsequent quid pro quo threats were severe, pervasive, hostile and disgusting." (*Id.* at p. 3). All these quoted statements were false.

42.     The Letter stated that Defendant "expects the University to take all necessary and appropriate steps to ensure that she is not forced to endure this type of discrimination any longer." (*Id.*).

43.     The Letter also stated that Defendant "further expects to be properly compensated for the harms that she has suffered as a result of [Plaintiff's] conduct." (*Id.*).

44.     Although Plaintiff objected to the false charges at the July Meeting, he was never given an opportunity to rebut them in detail by organizing and presenting evidence showing that the charges were completely false.

45.     Hofstra has clearly spelled out policies and procedures for addressing claims of sexual harassment and sex discrimination, including *inter alia* provisions for investigation, issuance of written reports, showing a copy of any such reports to the accused person, and providing the accused person an opportunity to respond.

46.     Upon information and belief, Hofstra did not fully and carefully investigate Defendant's complaint in accordance with its own EEO policy.

47.     Hofstra also has a procedure for informal action with respect to certain kinds of sex discrimination complaints but chose not to proceed with any informal action—to the contrary, Mone made clear to Plaintiff that a full investigation would be made and a report issued that Plaintiff would be able to see, which are components of Hofstra's formal procedure.

-8-

FILED: QUEENS COUNTY CLERK 06/01/2017 05:12 PM
NYSCEF DOC. NO. 2

INDEX NO. 707527/2017

RECEIVED NYSCEF: 06/01/2017

48. Upon information and belief, Hofstra did not in fact interview each of Defendant's teammates or other knowledgeable third parties about Defendant's complaints about Plaintiff's behavior toward the women on the tennis team.

49. Instead, after Mone had told Plaintiff the matter would be investigated, on September 7, 2016 (the "September Meeting"), he was called into another meeting with Mone, Hathaway and Evelyn Miller-Suber, the Director of Human Resources.

50. Mone started the September Meeting by telling Plaintiff "You are aware that there is a complaint against you".

51. Mone then repeated several of the false allegations that had been made at the July Meeting – including the one that Plaintiff had yelled at players on another team, which Hathaway had disputed at the July Meeting, but which he met with silence at the September Meeting.

52. In addition to the false statements contained in the Letter, Mone also told Plaintiff that allegations had been made that he had made statements to students about his divorce.

53. Upon information and belief, Defendant alleged that plaintiff made statements to students about his divorce and remarriage which were somehow inappropriate or improper. At this meeting, Mone indicated to Plaintiff that she she found these unspecified statements (along with the other false accusations contained in the Letter) to be a ground for termination of his employment.

54. Plaintiff's employment was terminated at the September Meeting.

-9-

FILED: QUEENS COUNTY CLERK 06/01/2017 05:12 PM

NYSCEF DOC. NO. 2

INDEX NO. 707527/2017

RECEIVED NYSCEF: 06/01/2017

55. This termination was the result of Defendant's false and defamatory statements, and upon information and belief, a condition of a settlement agreement between Defendant and Hofstra.

56. On or about September 9, one of Defendant's teammates told Plaintiff that she had seen a video posted by E.F., Defendant's roommate and teammate, on E.F.'s Snapchat account.

57. Upon information and belief, this Snapchat video showed Defendant and other teammates on the Hofstra women's tennis team dancing with a tag line stating "when your coach gets fired!"

58. One of the teammates in the video reached out to Plaintiff after she saw it to condemn the tag line used with the video and explain that she was unaware the video would be used in such a manner. The teammate told Plaintiff that she had been used as a prop by Defendant and by E.F.. She stated that Defendant had encouraged her and another girl to dance to music from a speaker while E.F. filmed it on her phone.

59. On or about September 10, 2016, another of Defendant's teammates told Plaintiff that she had confronted Defendant about making false statements about Plaintiff.

60. The teammate further alleged that Defendant had responded to her by threatening to tell Hofstra administrators falsehoods about the teammate as well. The teammate said she had reported the incident to Hathaway.

-10-

FILED: QUEENS COUNTY CLERK 06/01/2017 05:12 PM

NYSCEF DOC. NO. 2

INDEX NO. 707527/2017

RECEIVED NYSCEF: 06/01/2017

## FIRST CAUSE OF ACTION
### (DEFAMATION)

61.    Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1-60 above as if fully set forth herein.

62.    In making the statements contained and referenced in paragraphs 1 - 55, Defendant purported to be making statements of fact.

63.    Each of these statements by Defendant was false and defamatory and constituted defamation per se. Defendant intended to cause members of the public and in Plaintiff's professional environment to believe that Plaintiff was immoral, dishonest, abusive, and unfit to perform his profession.

64.    The false and defamatory statements about Plaintiff tend to expose Plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of him in the minds of right-thinking persons, and deprive him of friendly association in society. In the communities in which he works and performs, Plaintiff has been injured in his reputation and good-standing, and has been held up to ridicule and contempt.

65.    The statements Defendant has made about Plaintiff were calculated to injure Plaintiff in his profession, trade or business by imputing to him traits that, if true, would render him unfit to publicly perform his profession, and they in fact caused such injury as reflected in Hofstra's adverse employment action against Plaintiff.

66.    Upon information and belief, Defendant and her parents have used the defamatory statements to extort from Hofstra certain financial benefits, including scholarship monies for which Hofstra did not have any documentation, and other things of value to them.

-11-

INDEX NO. 707527/2017
RECEIVED NYSCEF: 06/01/2017

67.    By reason of the foregoing, Plaintiff has suffered general and special damages in an amount to be determined at trial, including termination of employment, damage to Plaintiff's reputation and standing in the community, shame, mortification, embarrassment, humiliation, damage to peace of mind, emotional distress, and injury in his occupation, as well as emotional harm and financial hardship to his family.

SECOND CAUSE OF ACTION
(PUNITIVE DAMAGES)

68.    Plaintiff repeats and re-alleges paragraphs 1 through 60 and 62-67 above as if fully set forth herein.

69.    Defendant has maliciously disseminated false information about Plaintiff with the malicious intent of causing maximum harm to him and his business and personal reputations for her own personal benefit and out of spite.

70.    Such willful and wanton misconduct by Defendant so shocks the conscience and is so out of keeping with the standards of morality that it entitles Plaintiff to an award of punitive damages.

71.    Neither the relief requested herein, nor any similar relief, has previously been sought by Plaintiff against Defendant.

WHEREFORE, Plaintiff prays for judgment against Defendant:

(a)    On the First Cause of Action awarding Plaintiff damages for defamation in an amount to be determined at trial, but no less than $100,000;

(b)    On the Second Cause of Action awarding Plaintiff punitive damages in an amount to be determined at trial;

-12-

FILED: QUEENS COUNTY CLERK 06/01/2017 05:12 PM
NYSCEF DOC. NO. 2

INDEX NO. 707527/2017

RECEIVED NYSCEF: 06/01/2017

(c)     awarding plaintiff his costs, disbursements, and legal expenses of this action;

and;

(d)     granting such other and further relief as the Court may deem just and proper.

Dated: New York, New York
        June 1, 2017

MENAKER & HERRMANN LLP

By: _____
        Cheryl L. Davis

Attorneys for Plaintiff
10 East 40th Street
New York, New York 10016
(212) 545-1900

TO:     C. D.
        c/o Phillips & Associates
        45 Broadway Suite 20
        New York, NY 10006
        (212) 248-7431
        Attn: David Schwartz, Esq.

-13-

Case 2:17-cv-05053-DRH-SAGB Document 10-1 Filed 01/05/07/17 Page 20 of 122 PageID #: 91

NYSCEF DOC. NO. 3

INDEX NO. 707527/2017

RECEIVED NYSCEF: 06/01/2017

# Exhibit A

FILED: QUEENS COUNTY CLERK 06/01/2017 05:12 PM INDEX NO. 707527/2017

NYSCEF DOC. NO. 3    RECEIVED NYSCEF: 06/01/2017



PHILLIPS **&** ASSOCIATES

*ATTORNEYS AT LAW*

45 BROADWAY SUITE 620, NEW YORK, NY 10006
TEL: 212-248-7431  FAX: 212-901-2107
WWW.NYCEMPLOYMENTATTORNEY.COM
A PROFESSIONAL LIMITED LIABILITY COMPANY

July 22, 2016

144 Hofstra University
Stuart Rabinowitz
Office of the President
Hempstead, NY 11549

Hofstra University
Lara S. Nochomovitz
Title IX Coordinator
214 Roosevelt Hall
Hempstead, NY 11549
Lara.Nochomovitz@hofstra.edu

Re: ▮▮▮▮▮▮ Title IX Complaint

To Whom It May Concern,

Please be advised that our office represents ▮▮▮▮▮▮ with regard to her complaints of Title IX sexual harassment violations by Hofstra University tennis coach ▮▮▮▮▮▮. This letter is being sent preliminarily to any further legal action in an attempt to reach an amicable resolution to the current situation. Please contact me on or before **Friday August 5, 2016** if you wish to discuss a resolution to this matter.

<u>Overview of Material Facts</u>

▮▮▮▮▮▮ Just finished her freshman year at Hofstra University. She was recruited by Hofstra's former tennis coach ▮▮▮▮▮▮ to play for the Hofstra tennis team. I ultimately enrolled at Hofstra in the fall of 2015, and was given an athletic scholarship to play tennis for the University.

Unfortunately, ▮▮▮ soon began to be subjected to unwanted and unwarranted sexual harassment by the new Hofstra tennis coach, ▮▮▮▮▮▮. In or about mid-January 2016, ▮▮ "friended" ▮▮▮ on Facebook. ▮▮▮ thought that it was odd for her male tennis coach to friend her on Facebook. However, at the time she did not think more of it other than it seemed awkward and unprofessional. Subsequently, ▮▮▮ posted a picture of herself on Facebook which showed her standing in front of the large red LOVE statue in New York City. At 12:30 a.m. on Valentine's day, ▮▮▮ (who goes by the pseudonym ▮▮▮▮ on Facebook) commented on the photo, "Looks like you found what you were hunting for in that jacket" and added a winking emoji face at the end of his comment. A screenshot of this picture and comment is attached to this letter.

▮▮▮▮▮▮ conduct would thereafter become significantly more harassing. ▮▮▮ had a strange obsession with ▮▮▮ menstrual cycle, and would repeatedly comment about when ▮▮▮ was getting her period. On one such occasion, during tennis practice, ▮▮ told one of ▮▮▮ teammates that ▮▮▮ seemed sluggish and that "it must be because of her period" because she "is

FILED: QUEENS COUNTY CLERK 06/01/2017 05:12 PM

INDEX NO. 707527/2017

NYSCEF DOC. NO. 3

RECEIVED NYSCEF: 06/01/2017

supposed to be getting it around this time." These comments made ▉▉▉▉ feel extremely uncomfortable, anxious, and violated. ▉▉▉▉▉ was also very concerned with his female players' appearances, telling the players that when they are out in public they must "dress nice" and must "shave their legs."

During a tennis tournament between Hofstra and Coppin State, ▉▉▉▉▉ began to tell his female players that a female opponent on the other team "winked at him" and that she was "good looking." ▉▉▉▉▉ comments regarding the physical attractiveness of another young female tennis player heightened ▉▉▉▉▉ level of discomfort and anxiety regarding ▉▉▉▉▉. During another tournament against Delaware, ▉▉▉ began to scream obscenities and verbal abuse at a female tennis player on the opposing team. ▉▉▉▉▉ conduct towards this female player was so disturbing that the parent of the player called Jeff Hathaway to complain about ▉▉▉▉▉ conduct.

In or around late March, 2016, ▉▉▉ spoke with ▉▉▉▉ about increasing her scholarship amount for her sophomore through senior year, as former coach ▉▉ had promised to do. ▉▉▉ responded that ▉▉▉ had a very successful year and nobody deserved the scholarship increase more than her.

However, things ultimately came to a head on or about April 6, 2016. ▉▉▉▉▉ sent a private Facebook message to ▉▉▉ which contained a Youtube video titled "Casually Explained: Is She Into You?" This 2 minute 31 second video features various cartoon depictions while a narrator describes how to tell if a girl is "into you" in different situations. The video starts by describing whether a girl who looks at you at a bar is "into you" and gets more graphic from there. The video next describes a scenario of physical touching in the workplace, and again asks if this would mean that a girl is "into you." The video moves on to a scenario where a male and a female are exercising in the same gym and the female winks at the male. Again, the video deliberates whether the girl is "into" the guy. The video then goes into the scenario of two friends talking about their last few "dates." Finally, the video talks about a scenario where a girl invites a guy "upstairs, dims the lights, rips off her clothes, and you start having sex." The video finally ends stating that you can't tell if the girl having sex is "into" the guy because "she might be Canadian and just be being polite."

This video is unquestionably inappropriate for a male college coach to send to his female player. By sending ▉▉▉ this video ▉▉▉ was clearly insinuating that he would like to know if ▉▉ is "into him." Furthermore, ▉▉▉ is from Toronto, and ▉▉▉▉▉ included text when he sent the video saying, "[l]ast part is the best. Maybe she's from Canada! I fell off my chair." The narrator in the video states that the girl in the video who rips off her clothes and begins having sex with the guy is from Canada. ▉▉▉▉▉ is clearly drawing a parallel between the girl having sex in the video and ▉▉▉ Shocked and confused, ▉▉▉ did not know how to respond to this message by her coach and simply stated "she's too nice." ▉▉▉▉ then wrote back, "Like extra friendly. Maybe a little fake." A screenshot of the message by ▉▉▉▉▉ is attached with this letter.

Roughly a week after ▉▉▉▉▉ sent ▉▉▉ the video, ▉▉▉ attitude and behavior towards ▉▉▉ completely changed. Prior to sending ▉▉▉ the video, ▉▉▉▉▉ never once threatened ▉▉▉▉ spot on the team or her scholarship. In fact, as previously stated, just before sending the video ▉▉▉ told ▉▉▉ that she had a very successful year and was the most deserving player for a scholarship increase. However, after ▉▉▉ did not respond to ▉▉▉▉▉ advances, ▉▉▉ soon began to threaten ▉▉▉▉ began to tell ▉▉▉ that he was going to "get girls" that are "better than her." Just a few days after sending ▉▉▉ this video ▉▉▉ suddenly began telling ▉▉▉ that he was no longer going to increase her scholarship. He then began to tell ▉▉▉

that her scholarship for the following year was in doubt, and that he was going to place ███ in a lower position on the team. This type of treatment was only directed at ███ In fact, during a conversation with a teammate, ███ stated her concern that ███ ███ wanted to get rid of all of the returning players. ███ teammate responded that it seemed ███ ███ was only interested in getting rid of ███ was one of the top two tennis players on the team measured by her performance in intercollegiate tennis matches.

These comments have taken an extreme toll on ███ mental health and well-being. She was, and continues to be, constantly anxious that she will be kicked off the team and lose her scholarship simply because she is not "into" her coach. These circumstances have forced ███ to look into her options for transferring to a program at another school, something that she does want to do as she has come to love everything about Hofstra, save for ███████.

<u>Title IX Analysis</u>

As I am sure is clear by the above facts, my client and I have serious concerns about the manner in which she has been treated by ███████. Title IX protects student athletes from sexual harassment by their coaches in both the creation of a hostile environment as well as quid pro quo demands. Title IX requires that once a college knows or reasonably should have known of possible sexual harassment of students, it must take immediate steps to investigate what happened and take prompt and effective steps to end any harassment, eliminate a hostile environment, and prevent harassment from occurring again.

The facts in this matter clearly rise to the level of hostile environment under Title IX. ███████ made numerous comments about ███ period, including outright stating that he thought she was playing poorly at practice because of her period. He demanded that the women "dress nice" and "shave their legs," which constituted a clear attempt to force the female players into conforming to traditional gender stereotypes. ███ made comments about the attractiveness of other female tennis players, and spewed various derogatory obscenities at opposing female players. Lastly, the video that ███ ███████ sent to ███ and the subsequent quid pro quo threats were severe, pervasive, hostile, and disgusting.

Likewise, ███ clearly has a claim under quid pro quo harassment as well. Before sending her the video, ███ never threatened ███ scholarship or her position on the team. He then sent ███ a video which was solely about different ways a girl can show a man that she is interested in him. After this video, ███████ suddenly began to continually threaten ███ position on the team, as well as her scholarship. Easily obtainable documentary evidence about the win-loss records of the various tennis players show that ███ was one of the top players on the team, and that there was no reason for ███ ███ to threaten her scholarship other than a quid pro quo demand.

<u>Conclusion</u>

Ultimately my client would like to reach an amicable settlement in this matter. My client expects the University to take all necessary and appropriate steps to ensure that she is not forced to endure this type of discrimination for a single second longer. My client further expects to be properly compensated for the harms that she has suffered as a result of ███ ███████ conduct.

Please note that if we cannot come to an agreeable settlement, my client has every intention of fighting this case in court. Given the allegations previously set forth, there is little to no chance that the

University will have grounds to dismiss this case either on a motion to dismiss or a motion for summary judgment. If we cannot come to an agreement on this matter, my client will "have her day in court" where she will be able to present concrete evidence of ███ ████████ conduct towards her to a jury. Furthermore, it would seem more than likely that many other women on the tennis team have similar concerns regarding treatment by ████████

Thank you for your attention to this matter. I look forward to hearing from your office soon to discuss my clients concerns and necessary steps that can be taken to bring this matter to a close. I can be reached by phone at (212) 248-7431, or by email at Dschwartz@tpglaws.com.

Sincerely,

David Schwartz, Esq.

# Exhibit B to Davis Declaration



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**New York District Office**

33 Whitehall Street, 5th Floor
New York, NY 10004-2112
For General Information: (800) 669-4000
TTY: (800)-669-6820

Kevin J. Berry
District Director

<u>Via U.S. Mail</u>

Jeffery Menaker
c/o Menaker & Herrmann, LLP
10 East 40th Street
New York, NY 10016-0301

Re:     ***Jeffery Menaker v. Hofstra University***
        ***EEOC Charge No. : 520-2017-01751***

Dear Mr. Menaker:

The U.S. Equal Employment Opportunity Commission ("EEOC" or "Commission") enforces discrimination laws under Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), which prohibits employment discrimination based on race, color, sex, religion, national origin, and pregnancy; the Equal Pay Act of 1963 ("EPA"), which protects men and women who perform substantially equal work in the same establishment from sex-based wage discrimination; the Age Discrimination in Employment Act of 1967 ("ADEA"), which protects individuals who are 40 years of age or older; The Americans with Disabilities Act of 1990, as amended ("ADA"), which prohibits discrimination against qualified individuals with disabilities, and the Genetic Information Nondiscrimination Act of 2008 ("GINA").

The Commission has Charge of Discrimination ("Charge") prioritization procedures and these procedures call for the EEOC to focus its limited resources on those cases that are most likely to result in findings of violations of the laws that the Commission enforces. In accordance with these procedures the EEOC has evaluated your Charge and based upon the evidence that you have submitted, the Commission has decided not to further pursue its investigation of this Charge. This Determination is final.

Enclosed is your ***Notice of Right to Sue ("NRTS")***. If you wish to purse this matter, you must file a lawsuit against Hofstra University in Federal District Court within **90 days** of the receipt of your NRTS; otherwise your Right to Sue will be lost. If you have any questions regarding your NRTS, after you have read the enclosed NRTS information sheet, you can contact Federal Investigator Sanford at **Patrick.Sanford@eeoc.gov**.

Sincerely,

_____ for

Kevin J. Berry
District Director

MAY 3 0 2017

_____
Date

**CC:  Charging Party's Attorney**

EEOC Form 161 (11/09)

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION ("EEOC")

## DISMISSAL AND NOTICE OF RIGHTS

| To: | From: |
|---|---|
| **Jeffery Menaker**<br>**c/o Menaker & Herrmann, LLP**<br>**10 East 40th Street**<br>**New York, NY 10016-0301** | **New York District Office**<br>**33 Whitehall Street – 5th Floor**<br>**New York, NY 10004** |

☐    *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **520-2017-01751** | **Patrick Sanford, Federal Investigator** | **(212) 336-3677** |

**THE EEOC IS CLOSING ITS INVESTIGATION OF THIS CHARGE OF DISCRIMINATION ("CHARGE") FOR THE FOLLOWING REASON:**

☐    The facts alleged in the Charge fail to state a claim under any of the statutes enforced by the EEOC.

☐    The allegations in the Charge did not involve a disability as defined by the Americans with Disabilities Act.

☐    The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐    Your Charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your Charge

☒    The EEOC issues the following determination:  Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes.  This does not certify that the Respondent is in compliance with the statutes.  No finding is made as to any other issues that might be construed as having been raised by this Charge.

☐    The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this Charge.

☐    Other:

## - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court.  Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost.  (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

*Kevin J. Berry* (signature)

**Kevin J. Berry**
**District Director**

MAY 30 2017

*(Date Mailed)*

Enclosures(s)

cc:    **Respondent:**
**Hofstra University**
**Attn: Office of Legal Affairs**
**144 Hofstra University**
**Hempstead, NY 11549**

**Charging Party's Attorney:**
**Menaker & Herrmann, LLP**
**Attn: Cheryl Davis, Esq.**
**10 East 40th Street**
**New York, NY 10016-0301**
**(212) 545-1900**

Enclosure with EEOC
Form 161 (11/09)

### INFORMATION RELATED TO FILING SUIT
### UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS      --   Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days of the date you *receive* this Notice**. Therefore, you should **keep a record of this date**. Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *mailed* to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS      --   Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years) before you file suit** may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit *before 7/1/10 -- not* 12/1/10 -- in order to recover unpaid wages due for July 2008. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice *and* within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION      --   Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do *not* relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE      --   All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request within 6 months of this Notice**. (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

# Exhibit C to Davis Declaration

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF QUEENS
-------------------------------------------------------------X
A.B.,

                                  Plaintiff,

                  -against-

HOFSTRA UNIVERSITY,

                                  Defendant.
-------------------------------------------------------------X

Index No. 711869/2017

**VERIFIED COMPLAINT**

        Plaintiff A.B., by his attorneys Menaker & Herrmann LLP, for his complaint against defendant alleges as follows:

### Nature of the Action

    1.      Plaintiff brings this action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e et seq., New York City Human Rights Law 8-101, et seq., and NY State Human Rights Law Executive Law Article 15 § 296 to remedy acts of employment discrimination perpetrated against him by Defendant Hofstra University.  Plaintiff contends that Hofstra officials discriminated against him by terminating his employment as Hofstra's varsity tennis coach on the basis of false and defamatory statements by a student athlete, who was attempting to extort an increase in her athletic scholarship by claiming sexual harassment. Hofstra's decision makers, all women, did not properly investigate the claim and failed even to follow Hofstra's basic procedures for dealing with harassment accusations. Instead, they accepted at face value

the false assertions of the tennis player because she is female, and directed the Athletics Department to terminate plaintiff's employment because of his gender (male).

## The Parties

2.      Plaintiff is a New York citizen residing in Woodside, NY. He brings this action using the initials "A.B." because the false and defamatory statements recited herein create a serious risk to his reputation and career.

3.      Upon information and belief, Defendant Hofstra University ("Hofstra") is a private, non-profit, nonsectarian university with its main campus on Long Island in the village of Hempstead, New York. It represents itself as being Long Island's largest private institution of higher education.

## Background Facts

4.      On or about January 15, 2016, Hofstra hired Plaintiff as the Director of Tennis in the Department of Athletics (the "Department") and Head Coach of the Men's and Women's Varsity Tennis Teams. One of Plaintiff's responsibilities as Director of Tennis was to administer athletic scholarships for the Hofstra tennis programs.

5.      Upon information and belief, Hofstra's prior Director of Tennis had resigned prior to the commencement of the 2015-16 academic year.

6.      When Plaintiff started working at Hofstra in January 2016, he inherited the arrangements that the prior Director of Tennis had already put in place, which included the annual allocation of athletic scholarship funds to members of the tennis teams.

- 2 -

7.     In late April 2016, just before leaving for the season-ending conference tournament, a student ("Student")[1], who was then a first-year foreign student on the Women's Varsity Tennis Team, approached Plaintiff in the parking lot near the Hofstra tennis courts. She wanted to confirm that her 45% athletic scholarship would be increased to a full scholarship for the following school year, starting in the fall of 2016. Student claimed that this increase had been promised by the previous Director of Tennis.

8.     Plaintiff told Student that he knew nothing about this arrangement but said he would investigate.

9.     Plaintiff thereafter reviewed Student's financial aid records and reported the conversation to his supervisor, Alyssa Morales-Kelly ("Morales-Kelly"), the sports administrator for tennis in the Department. Morales-Kelly confirmed that the Department had no record of a promise to increase Student's athletic scholarship.

10.     Shortly thereafter, Plaintiff followed up with Student, who said the prior Director of Tennis had only promised this to her orally, and admitted that the offer had never been in writing. Plaintiff told Student he had no ability to increase her scholarship for the coming year but could offer her a full scholarship for her junior and senior years. Student replied that she would inform her parents, and Plaintiff said they should feel free to call him with any questions.

---

[1] In the interest of the student's privacy, the student's name is being kept confidential in this pleading.

11.    In early May 2016, Plaintiff received a call from Student's father ("Father"), presumably from his home in Ontario.  Upon information and belief, Father is a native of Russia and was a state-funded athlete there before immigrating to Israel and later Canada. Father shouted at Plaintiff on the phone for approximately a half hour. He accused Plaintiff of reneging on a commitment supposedly made by the prior Director of Tennis and threatened that if Plaintiff did not guarantee Student a full scholarship, trouble would "come back to [him]".

12.    Plaintiff immediately reported Father's call and abusive behavior to Morales-Kelly, who instructed him to take no further action.

13.    In May 2016, Student visited Plaintiff's office and told him that her parents could no longer afford to send her to Hofstra and that she would probably have to transfer to another school. Plaintiff told Student he was disappointed that her parents had reached this conclusion, and repeated his offer to grant her a full scholarship for her junior and senior years. She stated that she would have to check with her parents, but she did not make any subsequent response to this offer.

14.    In May 2016, the Hofstra Athletic Department administered year-end computer surveys ("Surveys") in which the tennis teams were required to provide anonymous reviews of the tennis season and the coaching staff. The Surveys were known to be viewed by administrators only. When Plaintiff met with Morales-Kelly to discuss these reviews in connection with his own end-of-semester review, Morales-Kelly mentioned no criticisms from any student review; instead, the reviews conveyed to

- 4 -

Plaintiff were quite positive about his performance and the changes he had made in the program.

15. In late May 2016, Student called Plaintiff to ask him for a "release" under NCAA rules that would permit her to transfer to another university and tennis program. Plaintiff conferred with Morales-Kelly, who stated that she believed the request for the release was a ploy by Student to see if she could get more financial aid from Hofstra.

16. After meeting with Morales-Kelly, Plaintiff told Student that he would provide the requested release, but stated that this would mean that his offer of additional financial aid at Hofstra for her junior and senior years would then be rescinded.

17. Student subsequently texted Plaintiff on June 3, 2016 to ask what would happen to her financial aid if she came back to Hofstra after talking with other schools because her parents were "not understanding exactly what could happen."

18. Plaintiff emailed Student on June 6, 2016 to verify what he had previously told her and also texted her the same information. That same day Student texted Plaintiff to say that she might stay at Hofstra for the fall semester while continuing to look for another school.

19. On June 23, 2016, Student texted Plaintiff saying "Hi Coach, I'm coming back in the fall." On June 29, 2016, Student admitted to Plaintiff in a telephone conversation that she "never really looked for another school."

- 5 -

**Student's Defamatory Complaint**

20.    In late July 2016, Plaintiff was summoned to the office of the General Counsel for the University (the "July Meeting") along with Jeffrey Hathaway, the Vice President and Director of Athletics ("Hathaway").

21.    Deputy General Counsel Jennifer Mone ("Mone") started the meeting by asking (while apparently reading from an undisclosed document) questions about Plaintiff's methods of communication with members of the tennis program. Plaintiff stated that he used various forms of electronic communication, as is standard in athletics programs.

22.    Mone then questioned Plaintiff in a hostile manner about his communications with students. Plaintiff answered the first few of these questions but then asked if he might have a chance to read the document to which Mone seemed to be referring before answering further.

23.    Mone then handed Plaintiff a letter from a lawyer purporting to represent Student dated July 22, 2016 (the "Letter"), described therein as "[Student's] Title IX Complaint" (**Exhibit A[2]**).

24.    In the Letter, Student made numerous false accusations in which she claimed, *inter alia,* that she had been "subjected to unwanted and unwarranted sexual harassment by [Plaintiff]," that Plaintiff had "a strange obsession with [Student's]

---

[2] This Letter has been redacted to protect Plaintiff's and Student's privacy.

menstrual cycle, and would repeatedly comment about when [Student] was getting her period," that "[Plaintiff] was also very concerned with his female players' appearances, telling the players that when they are out in public they must 'dress nice' and must 'shave their legs,'" and that "after [Student] did not respond to [Plaintiff's] advances, [Plaintiff] soon began to threaten [Student]" (Id.).

25.     Student also claimed that "[d]uring another tournament against Delaware, [Plaintiff] began to scream obscenities and verbal abuse at a female tennis player on the opposing team. [Plaintiff's] conduct towards this female player was so disturbing that the parent of the player called Hathaway to complain about [Plaintiff's] conduct." (Id.).

26.     The Letter stated that Student "expects the University to take all necessary and appropriate steps to ensure that she is not forced to endure this type of discrimination any longer." and that Student *further expects to be properly compensated for the harms that she has suffered as a result of [Plaintiff's] conduct.*" (Id., emphasis added).

27.     Plaintiff denied all the accusations contained in the Letter at the July Meeting as false, taken out of context, and misleading. Hathaway himself vigorously disputed the charge described in paragraph 25 above, which he knew to be false based on an investigation of that charge when it was made.

28.     Mone thereupon instructed Plaintiff to collect copies of all his communications with Student and provide them to Mone as soon as possible and not to

discuss the matter with anyone. Mone stated that an investigation would be promptly conducted and that a report would be issued and shared with Plaintiff.

29.     Hathaway subsequently assured Plaintiff that complaints such as Student had made were not uncommon and that the General Counsel's office at Hofstra was very good at handling them. He told Plaintiff repeatedly in the weeks that followed that he assumed the complaint was a ploy from Student's parents and not to blame Student herself.

30.     Plaintiff provided all the emails and text messages between him and Student and pointed out that the time frames described in the letter were provably false. The various written messages demonstrated clearly how Student had handled the attempt to extort an increase in her athletic scholarship.

31.     Plaintiff offered to give complete cooperation to show the falsity of every one of Student's charges, but Hofstra made no further requests from him.

32.     Since he had been instructed not to discuss the matter with anyone, Plaintiff did not discuss the complaint with team members, but he suggested to Hofstra specific team members who could provide helpful information in connection with the investigation.

33.     After the July Meeting, Plaintiff asked Morales-Kelly if the Surveys contained any complaints about him. She told him "No." Apparently Student had not complained, even anonymously, about Plaintiff before her counsel sent Hofstra a demand

letter. Nor did Student choose to take any other action of the kind set out in Hofstra's policies (see ¶ 41 below).

34. Plaintiff thereafter engaged his present counsel, who called Mone after the July Meeting and identified themselves as Plaintiff's attorneys. Mone advised plaintiff's counsel to refrain from taking legal action against Student and her family and to leave everything in the hands of Hofstra, which was experienced in dealing with such matters. Mone promised to keep Plaintiff's counsel informed of the status of the investigation.

35. In the following weeks, neither Plaintiff nor Plaintiff's counsel were informed about the progress of Hofstra's investigation of the charges made in the Letter. Hathaway himself expressed frustration to Plaintiff at several times during the summer that he was not receiving guidance from Hofstra's General Counsel on how to proceed with respect to Student.

36. The Hofstra University Harassment Policy ("Hofstra Policy", attached hereto as **Exhibit B**) contains clearly spelled out policies and procedures for addressing claims of sexual harassment and sex discrimination. These include, *inter alia,* provisions for investigation which require (i) the issuance of written reports, (ii) showing a copy of any such reports to the accused person, and (iii) providing the accused person with an opportunity to respond.

37. Upon information and belief, Hofstra did not fully and carefully investigate Student's complaint in accordance with its own EEO policy.

- 9 -

38.     Hofstra also has a procedure for informal action with respect to certain kinds of sex discrimination complaints, but chose not to follow that informal procedure in this case. To the contrary, Mone made clear to Plaintiff that a full investigation would be made and stated a report issued that Plaintiff would be able to see; a formal investigation and providing a copy of the report to the accused party are components of Hofstra's formal procedure.

39.     Upon information and belief, Hofstra did not in fact interview each of Student's teammates or other knowledgeable third parties about Student's complaints about Plaintiff's behavior toward the women on the tennis team.

**The September Meeting**

40.     On September 7, 2016 (the "September Meeting"), Plaintiff was instructed to attend a meeting with Evelyn Miller-Suber ("Miller-Suber"), Hofstra's Director of Human Resources. He was not told the purpose of the meeting or given an opportunity to prepare for it. When he arrived at the September Meeting, he saw that Mone and Hathaway were also present.

41.     Mone started the September Meeting by telling Plaintiff "You are aware that there is a complaint against you." Mone then repeated several of the false allegations that had been made and rebutted at the July Meeting, such as that Plaintiff had yelled at players on another team. While Hathaway had disputed this allegation at the July Meeting, he met this false allegation with silence at the September Meeting.

- 10 -

42.     In addition to repeating the false statements contained in the Letter, Mone also told Plaintiff that it had been alleged that he made statements to students about his divorce. This was a new allegation which was not included in the Letter and with which Plaintiff was confronted for the first time at the September Meeting.

43.     After she completed her statement, Mone left and Miller-Suber informed Plaintiff that he was fired for "unprofessional conduct." She stated that while none of the specific allegations (which were never stated to be proven) in and of themselves were sufficient for termination, his employment was being terminated based on the "totality" of the allegations.

44.     In view of the complete lack of merit in the charges and the evident absence of a proper investigation in accordance with Hofstra's own written procedures and policies, it is clear that Plaintiff's employment was terminated as a result of raw bias against Plaintiff based on his gender.

45.     The Hofstra Harassment Policy has clear procedures for handling harassment complaints, which were not followed in this case. The Policy provides, *inter alia*:

> a.   "Investigation By the Equal Rights and Opportunity Officer: The Equal Rights and Opportunity Officer or a designee shall conduct an investigation of the Formal Complaint, which shall include discussing the nature of the complaint and its allegations with the responding party, reviewing any relevant documents or other materials, and interviewing potential witnesses to the alleged harassment, including administrators, faculty members, staff members, students or other persons who may have knowledge of the situation." (Exhibit B, page 7).

- 11 -

b.  "The responding party shall have the right to submit a written response to the Formal Complaint, accompanied by any relevant documents or other material he or she may wish to include (including any witnesses he or she may wish to suggest), within ten (10) calendar days of receiving a copy of the Formal Complaint." (*Id.,* page 7).

46.     The Hofstra Harassment Policy also contains the following additional provision relevant to the charges against Plaintiff:

a.     the EEO officer "shall render a written determination as to whether there is reasonable cause to believe that the harassment policy has been violated";

b.     "Upon making a reasonable cause finding, the Equal Rights and Opportunity Officer should attempt to reach an informal resolution…";

c.     [And if such efforts prove unsuccessful] "the case shall be referred to the University Harassment Review Board for commencement of formal proceedings."

d.     Appeal: "*Within fifteen (15) calendar days* after receiving a copy of the UHRB's written finding either party may submit written objections to the findings with the President of the University." (emphasis in the original)

47.     The Hofstra Harassment Policy explicitly provides for the possibility of false complaints:

"False Complaints: Due to the nature of harassment, complaints of harassment cannot always be substantiated. Lack of corroborating evidence should not discourage a complaining party from seeking relief through the procedures outlined above. However, complaints found to have been intentionally dishonest or made maliciously or without regard for the truth will subject the complaining party to disciplinary action in accordance with relevant University procedures." (*Id.,* page 8).

- 12 -

48.   Plaintiff's rights under the Hofstra's Harassment Policy were denied in this case. Every outlined step allowing for response was ignored, and Plaintiff was deprived of due process. No proper investigation was conducted and no reports were provided to Plaintiff, despite Mone's express representation that she would do so. The University Harassment Review Board process avenues in paragraph 46, *supra*, was never once presented as an option to Plaintiff. Hofstra acted to ambush and mislead Plaintiff and his counsel while circumventing its own protocol. Upon information and belief, these actions were taken by Hofstra personnel who were exclusively women and were biased against Plaintiff because of his gender; upon information and belief, Hathaway's involvement in the process was purely nominal.

49.   Following Plaintiff's termination, numerous events occurred which put Student's credibility into question and should have convinced Hofstra to, at a minimum, reopen the matter:

a.   On or about September 9, one of Student's teammates told Plaintiff that she had seen a video posted by Student's roommate and teammate ("Student #2"), on Student #2's Snapchat account. Upon information and belief, this Snapchat video showed Student and other teammates on the Hofstra women's tennis team dancing with a tag line stating "when your coach gets fired!" One of the teammates who appeared in the video reached out to Plaintiff after she saw it to condemn the tag line used with the video and explain that she was unaware the video would be

- 13 -

used in such a manner. The teammate told Plaintiff that she had been used as a prop by Student and by Student #2. She stated that Student had encouraged her and another girl to dance to music from a speaker while Student #2 filmed it on her phone.

b.      On or about September 10, 2016, two of Student's teammates told Plaintiff that they had confronted Student about making false statements about Plaintiff. The teammate further alleged that Student had responded to her by threatening to tell Hofstra administrators falsehoods about the teammate as well. The teammate said she had reported the incident to Hathaway.

**Exhaustion of Federal Administrative Remedies**

50.      On March 6, 2017, Plaintiff filed a charge with the Equal Employment Opportunity Commission regarding the defendant's alleged discriminatory conduct.

51.      The Equal Employment Opportunity Commission issued a Notice of Right to Sue letter, which Plaintiff received on 5/30/17 and which is attached hereto as **Exhibit C**. The letter authorizes Plaintiff to proceed in either state or federal court.

- 14 -

**First Cause of Action**
**Gender Discrimination in Violation of Title VII of the**
**Civil Rights Act of 1964**

52.     Plaintiff incorporates by reference the allegations in paragraphs 1 through 51 above as if set forth in full herein.

53.     The Defendant's conduct as alleged at length herein constitutes discrimination based on gender in violation of Title VII, 42 USC 2000e. et seq. The stated reasons for the Defendant's conduct were not the true reasons, but instead were pretext to hide the Defendant's discriminatory animus.

54.     As a result of the foregoing, Plaintiff has been damaged by the loss of his employment and his reputation, which has impeded his ability to obtain subsequent employment.

55.     Plaintiff is therefore entitled to receive damages in an amount to be determined at trial, including punitive damages.

56.     Plaintiff is entitled to recover attorneys' fees under Title VII.

**Second Cause of Action**
**Gender Discrimination Under New York State Human Rights Law**

57.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 51 above as if herein set forth in full.

58.     Defendant terminated Plaintiff's employment due to his gender (male), in violation of NY State Human Rights Law Executive Law Article 15 § 296 ("NYSHRL").

- 15 -

59.     As a result of the foregoing, Plaintiff has been damaged by defendant's acts in violation of NYSHRL.

60.     Plaintiff is therefore entitled to receive damages in an amount to be determined at trial, including punitive damages.

### Third Cause of Action
### (Attorneys' Fees under State Law)

61.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 51 above as if herein set forth in full.

62.     By reason of the foregoing, Plaintiff is entitled to recover attorneys' fees under NYSHRL.

WHEREFORE, plaintiff prays for judgment:

(a) Awarding Plaintiff damages on the First Count in an amount to be determined at trial;

(b) Awarding Plaintiff damages on the Second Count in an amount to be determined at trial;

(c) Awarding Plaintiff attorneys' fees and costs; and

(d) Awarding such other and further relief as to the Court may seem just and proper.


Dated:     New York, New York
           August 25, 2017

                                    MENAKER & HERRMANN LLP

                                    By: _____
                                              Cheryl L. Davis

                                    Attorneys for Plaintiff
                                    10 East 40th Street
                                    New York, NY 10016
                                    (212) 545-1900

- 17 -

## VERIFICATION

STATE OF NEW YORK )
                              ) ss.:
COUNTY OF NEW YORK )

CHERYL L. DAVIS, being duly sworn, deposes and says:

1.       I am a member of the Bar of this Court and one of the attorneys for the plaintiff in this action. I have read the foregoing complaint and know the contents thereof and it is true to my own knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true. This verification is made by me instead of the plaintiff because the plaintiff is not within the county where attorneys for plaintiff maintain their offices.

2.       As to those matters alleged upon information and belief, the source of my information and the grounds for my belief are materials and records contained in my file.

Dated:    New York, New York
            August 25, 2017

                                    MENAKER & HERRMANN LLP

                                           Cheryl L. Davis

Subscribed and sworn to before me
this 25th day of August, 2017.

_____
      Notary Public

KAREN KIM
Notary Public, State of New York
No. 02KI6188009
Qualified in Queens County
Commission Expires November 30, 2020

# Exhibit A



PHILLIPS & ASSOCIATES
*ATTORNEYS AT LAW*
45 Broadway Suite 620, New York, NY 10006
Tel: 212-248-7431   Fax: 212-901-2107
WWW.NYCEMPLOYMENTATTORNEY.COM
A PROFESSIONAL LIMITED LIABILITY COMPANY

July 22, 2016

144 Hofstra University
Stuart Rabinowitz
Office of the President
Hempstead, NY 11549

Hofstra University
Lara S. Nochomovitz
Title IX Coordinator
214 Roosevelt Hall
Hempstead, NY 11549
Lara.Nochomovitz@hofstra.edu

Re: ▉▉▉▉▉      Title IX Complaint

To Whom It May Concern,

Please be advised that our office represents ▉▉▉▉▉ with regard to her complaints of Title IX sexual harassment violations by Hofstra University tennis coach ▉▉▉▉▉. This letter is being sent preliminarily to any further legal action in an attempt to reach an amicable resolution to the current situation. Please contact me on or before <u>Friday August 5, 2016</u> if you wish to discuss a resolution to this matter.

<u>Overview of Material Facts</u>

▉▉▉▉▉ Just finished her freshman year at Hofstra University. She was recruited by Hofstra's former tennis coach ▉▉▉▉▉ to play for the Hofstra tennis team. ▉▉▉ ultimately enrolled at Hofstra in the fall of 2015, and was given an athletic scholarship to play tennis for the University.

Unfortunately, ▉▉▉▉ soon began to be subjected to unwanted and unwarranted sexual harassment by the new Hofstra tennis coach, ▉▉▉▉▉. In or about mid-January 2016, ▉▉ ▉▉▉▉ "friended" ▉▉▉▉ on Facebook. ▉▉▉▉ thought that it was odd for her male tennis coach to friend her on Facebook. However, at the time she did not think more of it other than it seemed awkward and unprofessional. Subsequently, ▉▉▉▉ posted a picture of herself on Facebook which showed her standing in front of the large red LOVE statue in New York City. At 12:30 a.m. on Valentine's day, ▉▉▉▉ (who goes by the pseudonym ▉▉ ▉▉▉▉ on Facebook) commented on the photo, "Looks like you found what you were hunting for in that jacket" and added a winking emoji face at the end of his comment. A screenshot of this picture and comment is attached to this letter.

▉▉▉▉▉ conduct would thereafter become significantly more harassing. ▉▉▉▉ had a strange obsession with ▉▉▉▉ menstrual cycle, and would repeatedly comment about when ▉▉▉ was getting her period. On one such occasion, during tennis practice, ▉▉ ▉▉▉▉ told one of ▉▉▉▉ teammates that ▉▉▉▉ seemed sluggish and that "it must be because of her period" because she "is

supposed to be getting it around this time." These comments made ▇▇▇ feel extremely uncomfortable, anxious, and violated. ▇▇ ▇▇▇▇ was also very concerned with his female players' appearances, telling the players that when they are out in public they must "dress nice" and must "shave their legs."

During a tennis tournament between Hofstra and Coppin State, ▇▇▇▇▇ began to tell his female players that a female opponent on the other team "winked at him" and that she was "good looking." ▇▇▇ comments regarding the physical attractiveness of another young female tennis player heightened ▇▇▇▇ level of discomfort and anxiety regarding ▇▇▇▇. During another tournament against Delaware, ▇▇ began to scream obscenities and verbal abuse at a female tennis player on the opposing team. ▇▇▇▇ conduct towards this female player was so disturbing that the parent of the player called Jeff Hathaway to complain about ▇▇▇▇▇▇ conduct.

In or around late March, 2016, ▇▇▇▇ spoke with ▇▇ ▇▇▇ about increasing her scholarship amount for her sophomore through senior year, as former coach ▇▇ had promised to do. ▇▇ ▇▇▇ responded that ▇▇▇▇ had a very successful year and nobody deserved the scholarship increase more than her.

However, things ultimately came to a head on or about April 6, 2016. ▇▇▇▇▇ sent a private Facebook message to ▇▇▇ which contained a Youtube video titled "Casually Explained: Is She Into You?" This 2 minute 31 second video features various cartoon depictions while a narrator describes how to tell if a girl is "into you" in different situations. The video starts by describing whether a girl who looks at you at a bar is "into you" and gets more graphic from there. The video next describes a scenario of physical touching in the workplace, and again asks if this would mean that a girl is "into you." The video moves on to a scenario where a male and a female are exercising in the same gym and the female winks at the male. Again, the video deliberates whether the girl is "into" the guy. The video then goes into the scenario of two friends talking about their last few "dates." Finally, the video talks about a scenario where a girl invites a guy "upstairs, dims the lights, rips off her clothes, and you start having sex." The video finally ends stating that you can't tell if the girl having sex is "into" the guy because "she might be Canadian and just be being polite."

This video is unquestionably inappropriate for a male college coach to send to his female player. By sending ▇▇▇▇ this video ▇▇▇▇▇▇ was clearly insinuating that he would like to know if ▇▇▇ is "into him." Furthermore, ▇▇▇▇ is from Toronto, and ▇▇▇▇▇▇ included text when he sent the video saying, "[l]ast part is the best. Maybe she's from Canada! I fell off my chair." The narrator in the video states that the girl in the video who rips off her clothes and begins having sex with the guy is from Canada. ▇▇▇▇▇▇ is clearly drawing a parallel between the girl having sex in the video and ▇▇▇ Shocked and confused, ▇▇▇▇ did not know how to respond to this message by her coach and simply stated "she's too nice." ▇▇▇▇ then wrote back, "Like extra friendly. Maybe a little fake." A screenshot of the message by ▇▇▇▇▇ is attached with this letter.

Roughly a week after ▇▇ ▇▇▇ sent ▇▇▇ the video, ▇▇▇▇ attitude and behavior towards ▇▇▇ completely changed. Prior to sending ▇▇▇ the video, ▇▇▇▇ never once threatened ▇▇▇▇ spot on the team or her scholarship. In fact, as previously stated, just before sending the video ▇▇▇▇ told ▇▇▇ that she had a very successful year and was the most deserving player for a scholarship increase. However, after ▇▇▇ did not respond to ▇▇▇▇ advances, ▇▇▇ soon began to threaten ▇▇ ▇▇▇ began to tell ▇▇▇ that he was going to "get girls" that are "better than her." Just a few days after sending ▇▇▇ this video ▇▇▇▇▇▇ suddenly began telling ▇▇▇ that he was no longer going to increase her scholarship. He then began to tell ▇▇▇

that her scholarship for the following year was in doubt, and that he was going to place ▇▇▇ in a lower position on the team. This type of treatment was only directed at ▇▇▇ In fact, during a conversation with a teammate, ▇▇▇ stated her concern that ▇▇ ▇▇▇ wanted to get rid of all of the returning players. ▇▇▇ teammate responded that it seemed ▇▇▇▇▇▇ was only interested in getting rid of ▇▇▇ ▇▇▇ was one of the top two tennis players on the team measured by her performance in intercollegiate tennis matches.

These comments have taken an extreme toll on ▇▇▇ mental health and well-being. She was, and continues to be, constantly anxious that she will be kicked off the team and lose her scholarship simply because she is not "into" her coach. These circumstances have forced ▇▇▇ to look into her options for transferring to a program at another school, something that she does want to do as she has come to love everything about Hofstra, save for ▇▇▇▇▇▇▇.

<u>Title IX Analysis</u>

As I am sure is clear by the above facts, my client and I have serious concerns about the manner in which she has been treated by ▇▇▇▇▇▇. Title IX protects student athletes from sexual harassment by their coaches in both the creation of a hostile environment as well as quid pro quo demands. Title IX requires that once a college knows or reasonably should have known of possible sexual harassment of students, it must take immediate steps to investigate what happened and take prompt and effective steps to end any harassment, eliminate a hostile environment, and prevent harassment from occurring again.

The facts in this matter clearly rise to the level of hostile environment under Title IX. ▇▇▇▇▇▇ made numerous comments about ▇▇▇▇ period, including outright stating that he thought she was playing poorly at practice because of her period. He demanded that the women "dress nice" and "shave their legs," which constituted a clear attempt to force the female players into conforming to traditional gender stereotypes. ▇▇▇▇▇▇ made comments about the attractiveness of other female tennis players, and spewed various derogatory obscenities at opposing female players. Lastly, the video that ▇▇ ▇▇▇▇ sent to ▇▇▇ and the subsequent quid pro quo threats were severe, pervasive, hostile, and disgusting.

Likewise, ▇▇▇ clearly has a claim under quid pro quo harassment as well. Before sending her the video, ▇▇▇▇▇▇ never threatened ▇▇▇▇ scholarship or her position on the team. He then sent ▇▇▇ a video which was solely about different ways a girl can show a man that she is interested in him. After this video, ▇▇▇▇▇▇ suddenly began to continually threaten ▇▇▇▇ position on the team, as well as her scholarship. Easily obtainable documentary evidence about the win-loss records of the various tennis players show that ▇▇▇ was one of the top players on the team, and that there was no reason for ▇▇ ▇▇▇▇ to threaten her scholarship other than a quid pro quo demand.

<u>Conclusion</u>

Ultimately my client would like to reach an amicable settlement in this matter. My client expects the University to take all necessary and appropriate steps to ensure that she is not forced to endure this type of discrimination for a single second longer. My client further expects to be properly compensated for the harms that she has suffered as a result of ▇▇ ▇▇▇▇▇ conduct.

Please note that if we cannot come to an agreeable settlement, my client has every intention of fighting this case in court. Given the allegations previously set forth, there is little to no chance that the

University will have grounds to dismiss this case either on a motion to dismiss or a motion for summary judgment. If we cannot come to an agreement on this matter, my client will "have her day in court" where she will be able to present concrete evidence of ███ ████████ conduct towards her to a jury. Furthermore, it would seem more than likely that many other women on the tennis team have similar concerns regarding treatment by ████████████

Thank you for your attention to this matter. I look forward to hearing from your office soon to discuss my clients concerns and necessary steps that can be taken to bring this matter to a close. I can be reached by phone at (212) 248-7431, or by email at Dschwartz@tpglaws.com.

Sincerely,

David Schwartz, Esq.

# Exhibit B

# HOFSTRA UNIVERSITY HARASSMENT POLICY

## I. Introduction

As an academic institution of higher learning, Hofstra University is dedicated to providing an environment conducive to intellectual and personal growth, with all members of the community encouraged to participate to the fullest extent of their abilities. For Hofstra, this means a firm institutional commitment to academic freedom as defined in Section II of the Faculty Statutes. It also involves a commitment to norms of professional and interpersonal respect ensuring that no individuals are subjected to harassment or discriminated against in any way on the basis of race, color, religion, sex, sexual orientation, gender identity or expression, age, national or ethnic origin, physical or mental disability, marital or veteran status or any other characteristic protected by state or federal laws. These protected traits are referred to as "protected characteristics or beliefs" elsewhere in this Policy.

Harassment based on any of these characteristics is a form of discrimination prohibited by law and by Hofstra University. Whenever a violation of this policy is brought to the University's attention through appropriate channels or when the University otherwise becomes aware of a violation of this policy, prompt corrective action will be taken. All members of the Hofstra community are encouraged to contact the appropriate University offices if infringements of this policy come to their attention. Retaliation against anyone who files a complaint under this policy or participates in an investigation is prohibited.

## II. Harassment Policy Statement

### A. Harassment Prohibited

Hofstra University abides by the principle that its students, faculty, staff and administrators have a right to be free from unlawful harassment within the University community. Harassment is the creation of a hostile or intimidating environment in which verbal or physical conduct based on one's protected characteristics or beliefs, because of its severity and/or persistence, is likely to significantly interfere with an individual's work or education, or enjoyment of other University opportunities or activities. Harassment also includes coercive or threatening behavior based on one's protected characteristics or beliefs.

This policy covers the conduct of all University employees and students, as well as third parties such as vendors, contractors and visitors to campus. This applies to all areas of University programs and activities both on and off-campus, including overseas programs.

### B. Definition of Sexual Harassment

Generally, sexual harassment is conduct that exploits power or authority in order to elicit sexual submission, or inappropriate sexual conduct that creates an intimidating, hostile or abusive environment for working, learning, or enjoying other opportunities and

1

activities. Sexual harassment can include a wide range of behaviors, from the actual coercing of sexual relations, to repeated or egregious sexual suggestions or comments, to the unwelcomed emphasizing of sexual identity. The definition of sexual harassment, discussed more fully below, will be interpreted and applied consistent with current legal standards, as well as accepted standards of mature behavior, professional responsibility, academic freedom, and freedom of expression.

Sexual harassment in any situation is reprehensible; it is particularly damaging when it exploits the educational dependence and trust between and among students, faculty, staff and administrators. When the authority and power inherent in certain relationships, whether overtly, implicitly, or through misinterpretation, is abused in this way, there is potentially great damage to all parties involved, and to the educational climate of the institution.

For the purposes of this policy, sexual harassment may be defined as unwelcome sexual advances, requests for sexual favors, and other nonverbal, expressive or physical conduct of a sexual nature, when

- *submission to such conduct is explicitly or implicitly made a term or condition of employment or status in a course, program or activity; or*

- *submission to or rejection of such conduct is used as a basis for an academic or employment decision affecting the individual, or for a decision regarding an individual's status in a course, program or activity; or*

- *such conduct has the purpose or effect, when judged from the perspective of a reasonable person in the position of the complaining individual, of unreasonably interfering with an individual's academic or work performance, or creating an intimidating, hostile or offensive environment for working, learning, or enjoying other University opportunities, programs and activities.*

Determining whether sexual conduct creates an intimidating, hostile, or offensive environment or substantially interferes with an individual's academic or work performance or enjoyment of other University opportunities depends on the specific facts and the context in which the conduct occurs. To constitute sexual harassment, the conduct must be severe or pervasive. Thus, a hostile environment may arise from a single incident if sufficiently egregious, for example, certain physical contact, or from repeated actions such as repeated sexual comments, suggestions or jokes. Further, if such conduct or remarks take place in the teaching context, to conclude that they create an abusive environment it must be shown that they are not germane to the subject matter. The academic setting is distinct from the workplace in that wide latitude is required for professional judgment in determining the appropriate content and presentation of academic material.

Sexual harassment can involve conduct toward an individual of the opposite sex or of the same sex. In addition, sexual harassment may occur between peers or between individuals in a hierarchical relationship.

Examples of conduct covered by this policy (subject to the above conditions) include, but are not limited to:

- *unwanted flirtation, advances or propositions of a sexual nature;*

- *insults, humor, jokes, or anecdotes (not legitimately related to the subject matter of a course, if one is involved) that belittle or demean an individual's or a group's sexuality or sex;*

- *unwelcomed comments of a sexual nature about an individual's body or clothing;*

- *unwarranted displays of sexually suggestive objects or pictures;*

- *unwelcomed touching such as patting, pinching, hugging, or brushing against an individual's body;*

- *explicit or implied suggestions that submission to or rejection of sexual advances will affect decisions regarding such matters as an individual's employment, work assignments or status, salary, academic standing, grades, participation in programs or activities, athletic opportunities, receipt of financial aid, grants, leaves of absence, letters of recommendation, or other similar matters;*

- *tangible action taken against an individual (e.g. a demotion, lower grade) for refusing to submit to sexual advances, or threatening to take such actions; and*

- *sexual assault. (For additional information about sexual assault involving students, see the Sexual Assault Policy contained in the Guide to Pride).*

C. Definition of Other Forms of Harassment

Unlawful harassment, other than sexual harassment, is conduct that denigrates or shows hostility or aversion to a person on the basis of a protected characteristic or belief when such conduct has the purpose or effect of unreasonably interfering with an individual's work or academic performance, or creating an intimidating, hostile, or offensive environment for working, learning, or enjoying other University opportunities, programs and activities.

Protected characteristics or beliefs are listed in Section I of this policy.

3

Examples of other forms of harassment covered by this policy, include, but are not limited to:

- *verbal abuse, ridicule, slurs, epithets, stereotyping, and offensive and unwelcome jokes and comments;*

- *threatening, intimidating, or hostile acts; and*

- *displaying or distributing offensive materials, writings, graffiti, or pictures that denigrate or show hostility or aversion towards an individual or group based on any of the protected characteristics or beliefs set forth in this policy.*

## III. Harassment Complaint Procedure

Any member of the University community, including a student or employee, who believes that he or she has been subjected to harassment in violation of this policy may pursue redress through the appropriate complaint procedure. This complaint procedure is provided for the prompt and equitable resolution of complaints alleging harassment by members of the University community, including faculty members, staff members, administrators, and other persons. However, complaints of harassment against students arising out of their conduct as students shall be made to the Dean of Students Office and will be handled in accordance with the provisions set forth in the Student Judicial Code. Members of the University community may also choose to pursue one of the informal options discussed below.

### A. Confidentiality

1. Generally it is the policy of Hofstra University to protect the confidentiality of members of the University community who may be involved in harassment complaint procedures, insofar as that is reasonably practicable. Specifically, the identity of the complaining party, the identity of the accused offender (hereinafter referred to as the "responding party"), and information relating to the harassment complaint will be disseminated only to those individuals who have a legitimate need to know, or as reasonably necessary for the purpose of investigating or resolving the complaint.

Complaining parties should be informed and understand that, upon their advising a Harassment Adviser or the Equal Rights and Opportunity Officer of a harassment complaint, the University may be legally required to investigate that complaint. Therefore, complaining parties should understand that the complaint may be disclosed, as necessary, to persons other than the one(s) to whom the complaint is made, including the party complained of (hereafter referred to as "the responding party").

Although the University will endeavor to maintain the confidentiality of harassment complaints and proceedings in accordance with this policy, it

4

cannot absolutely guarantee against the further dissemination of information by individuals to whom such information was reasonably disclosed by the University in the course of a harassment investigation.

2. Waiver of Confidentiality: A complaining party or a responding party may be deemed to have waived, directly or indirectly, the confidentiality provisions of this policy by voluntarily disclosing information about the complaint or the complaint proceedings to parties within or outside the University community who are not directly involved in the investigation or complaint process. The University retains the right to respond as it deems appropriate, including the right to rebut or refute such allegations consistent with applicable law.

B. Retaliation

No individual shall be penalized or retaliated against in any way by a member of the University community for his or her participation in this complaint procedure: This protection includes both the complaining and responding parties and individuals who participate in an investigation of a harassment complaint. Every effort should be made to protect members of the University community so they may use or participate in the harassment complaint procedure without fear of reprisal or retaliatory action. Threats, other forms of intimidation, and retaliation against a complaining or responding party or any other party involved in implementing or utilizing the University's harassment complaint procedure are violations of this policy, and, thus, may be grounds for disciplinary action, including separation from the University, consistent with appropriate procedures.

Individuals who believe they have been retaliated against in violation of Hofstra's harassment policy must follow the complaint procedures outlined herein, and such complaints will be processed in accordance with those procedures.

C. Informal Procedure

The goal of the informal options is to end quickly the offending behavior without utilizing disciplinary action or the formal complaint procedure. However, no one is required to pursue an informal resolution and a complaining party may proceed immediately to the formal complaint procedure. If the informal options are not feasible or desired or do not result in a mutually agreeable solution or cessation of the offending conduct, the formal complaint procedure is available as well. Informal options include:

- Talking directly to the other party or writing a letter describing the unwelcome behavior and asking him or her to stop.

- Consulting with a University Harassment Adviser. Harassment Advisers are individuals specially trained by the University who are available to anyone to discuss issues relating to harassment or the University's policy and

procedures. Harassment Advisers may assist the parties in resolving a complaint informally without the need to file a formal complaint. A current list of Harassment Advisers is available from the Human Resources Office and the Equal Rights and Opportunity Officer.

- Speaking to members of the Student Counseling Center or campus Chaplains. Such conversations may be confidential because of the legal protections held by the specific persons receiving the information.

D. Formal Procedure[1]

1. Step One

   a. Whom to Contact: Individuals who believe they have been subjected to harassment in violation of this policy and seek to file a formal complaint should contact the Equal Rights and Opportunity Officer at (516) 463-7310, C/O Office of Legal Affairs and General Counsel, 101 Hofstra University, Hempstead NY 11549.[2] The Equal Rights and Opportunity Officer is the designated official responsible for the investigation of harassment complaints made by members of the University community, as well as for coordinating the processing of such complaints under this policy. Individuals who believe they have been subjected to harassment by a student in violation of this policy should contact the Dean of Students. If such a complaint is made to the Equal Rights and Opportunity Officer, the complaint will be forwarded to the Dean of Students for handling in accordance with the provisions of the Student Judicial Code. Complaints by individuals who believe they have been subjected to harassment by a third party such as a vendor, contractor or visitor to campus will be handled by the Equal Rights and Opportunity Officer, even though not subject to this formal complaint procedure.

   b. Timing of Complaint: An initial complaint of harassment to the Equal Rights and Opportunity Officer must be made within six months of the most recent occurrence of alleged harassment. The Equal Rights and Opportunity Officer is authorized to waive this timeliness requirement in extenuating circumstances. Even if the time to file a complaint has elapsed, any member of the University community who becomes aware of a potential violation of this policy is encouraged to report the violation to the Equal Rights and

---

[1] The Formal Complaint Proceedings Before the University Harassment Review Board for responding parties other than full-time faculty bargaining unit members and the Faculty Procedures for Formal Harassment Complaint Proceedings Before the University Harassment Review Board ("Faculty Procedures") are attached hereto as Appendices A and B, respectively.

[2] In the event that the complaining party believes that the Equal Rights and Opportunity officer may have a conflict of interest, or for other compelling reasons, he or she may report the complaint to the Director of Human Resources, or, where the complaining party is a student, to the Dean of Students. This officer will then take the role of the Equal Rights and Opportunity Officer in the procedure.

Opportunity Officer so that appropriate action may be taken. In order to facilitate investigation of a complaint, prompt reporting is encouraged.

c. Making a Written Complaint: If the complainant, after an initial discussion with the Equal Rights and Opportunity Officer, decides to proceed, the complainant must make the complaint in writing by filing a Harassment Complaint Form (hereinafter referred to as "Formal Complaint"). Such forms may be obtained from the Equal Rights and Opportunity Officer.

Investigation By the Equal Rights and Opportunity Officer: The Equal Rights and Opportunity Officer or a designee shall conduct an investigation of the Formal Complaint, which shall include discussing the nature of the complaint and its allegations with the responding party, reviewing any relevant documents or other materials, and interviewing potential witnesses to the alleged harassment, including administrators, faculty members, staff members, students or other persons who may have knowledge of the situation. If the responding party is a member of a union, the party will be advised before the date scheduled for his/her interview that s/he is entitled to request that a union representative be present during his or her interview. When the responding party is a bargaining unit member, the union will be notified in accordance with the relevant Appendix.

Neither the complaining party nor the responding party is entitled to the participation of legal representatives during the course of the Equal Rights and Opportunity Officer's investigation of the complaint. The responding party shall have the right to submit a written response to the Formal Complaint, accompanied by any relevant documents or other materials he or she may wish to include (including any witnesses he or she may wish to suggest), within ten (10) calendar days of receiving a copy of the Formal Complaint.

d. Informal Resolution: The Equal Rights and Opportunity Officer is authorized and encouraged to explore informal resolution of the complaint at any time after the complaint is received. The Equal Rights and Opportunity Officer shall advise both the complaining and responding parties that conciliation of the complaint is available should the parties so desire. Informal resolution is designed to obtain an expedient, mutually acceptable solution to a harassment problem without the necessity for conducting further investigation or hearings. The purpose of informal resolution is to attempt through discussion and inquiry to make an effort to resolve or "work out" the issue in a non-adversarial manner. Therefore, the Equal Rights and Opportunity Officer should be able to use a great degree of discretion and flexibility in deciding what kind of informal means would be most effective in accomplishing this end, provided that the result achieved is acceptable to both parties in interest.

If the Equal Rights and Opportunity Officer is able to resolve the complaint to both parties' satisfaction, the Equal Rights and Opportunity Officer should provide the parties with a written statement reflecting the terms of the resolution and stating that the agreed-upon resolution will be undertaken. The written statement of informal resolution should be signed by the complaining party and the responding party. Upon the signing of the written statement of informal resolution, the matter will be deemed closed, and no party will be permitted to appeal, contest, re-open, or otherwise attempt to set aside or amend the terms of the informal resolution as long as the terms are adhered to.

f. False Complaints: Due to the nature of harassment, complaints of harassment cannot always be substantiated. Lack of corroborating evidence should not discourage a complaining party from seeking relief through the procedures outlined above. However, complaints found to have been intentionally dishonest or made maliciously or without regard for the truth will subject the complaining party to disciplinary action in accordance with relevant University procedures.

g. Interim Action: If, at any point after proceedings have been initiated under this complaint procedure, it is determined that the responding party's continuance in his or her position within the University community threatens immediate harm to the complaining party or others, the Equal Rights and Opportunity Officer or other responsible officials, including the Provost or a Vice President may recommend to the President that the responding party be placed on leave with pay pending the outcome of the complaint procedure. After reviewing the current state of the evidence and consulting, as appropriate, with the individuals making the recommendation, the President may accept or reject the recommendation. The responding party's union will be notified if the President decides to suspend the responding party. The decision at this stage is preliminary in nature, is not a finding of fact, and any ultimate decision of the merits will be based solely on the hearing record. Prior to being placed on such leave, the responding party is entitled to submit a written statement to the President stating why he or she should not be placed on leave. This provision shall not restrict the President's authority with respect to administrative employees and is subject to any applicable collective bargaining agreement and disciplinary provisions with respect to union-represented employees.

h. Reasonable Cause Determination: After the investigation has been conducted, the Equal Rights and Opportunity Officer shall render a written determination as to whether there is reasonable cause to believe that the harassment policy may have been violated.

(1) "No Reasonable Cause" Finding
A finding of "no reasonable cause" means that the investigation has not revealed sufficient facts or circumstances indicating that the complaint may have merit. If the Equal Rights and Opportunity Officer makes a finding of no reasonable cause, he or she shall promptly notify the complaining party

8

and the responding party in writing The complaining party shall have *five (5) calendar days* from receipt of such notice in which to file a written appeal of the finding to the President. If the complaining party does not file an appeal of the no reasonable cause finding within the allotted time, the complaint will be dismissed. The President shall notify the responding party that an appeal has been filed and shall provide a copy of the appeal and supporting documents to the responding party, who shall have the right to file a written response thereto. The responding party's written response must be filed within *five (5) calendar days* after receiving notice of the appeal and copies of the supporting documents.

Upon receipt of the respective parties' written appeals, the President shall appoint a senior administrator to review the merits of the appeal. This administrator, after reviewing the respective parties' written appeals, and any other evidence or information he or she may deem relevant, may either affirm or reverse the Equal Rights and Opportunity Officer's determination of no reasonable cause. The decision of this administrator is final and non-appealable. If the Equal Rights and Opportunity Officer's determination is affirmed, the harassment complaint will be dismissed. If the determination is reversed, the matter will be remanded to the Equal Rights and Opportunity Officer, who shall proceed as if a reasonable cause finding has been made.

(2) "Reasonable Cause" Finding

A finding of "reasonable cause" means that the investigation has revealed facts or circumstances indicating that a violation of the harassment policy may have occurred, and, therefore, further proceedings are warranted. If the Equal Rights and Opportunity Officer makes a finding of reasonable cause, he or she shall promptly notify the complaining party and the responding party in writing. Upon making a reasonable cause finding, the Equal Rights and Opportunity Officer should attempt to reach an informal resolution, as discussed in Section II.D.1.e, and, if necessary, proceed to Step Two in the complaint procedure.

i.  Instituting Step Two Proceedings

If the Equal Rights and Opportunity Officer is unable to reach an informal resolution of the matter within *ten (10) calendar days* of the date the reasonable cause finding was made, the Equal Rights and Opportunity Officer shall so notify both the complaining party and the responding party in writing, and shall inform the parties that, if the complaining party chooses to proceed to Step Two, the case will be referred to the University Harassment Review Board for commencement of formal proceedings.

Timing: The complaining party has *ten (10) calendar days* from receipt of such notice to submit a written request to initiate proceedings under Step Two of the University's harassment complaint procedure, as described below.

2. Step Two

   a. Initiation of Proceedings: To initiate Step Two of the complaint procedure, the complaining party must file a written statement of intention to proceed to Step Two within the prescribed time period. The statement must be submitted to the Equal Rights and Opportunity Officer.

   b. The University Harassment Review Board: The University Harassment Review Board (the "UHRB") shall be responsible for processing Step Two harassment complaints within the University. The Equal Rights and Opportunity Officer will notify the University's General Counsel that Step Two proceedings have been initiated and the General Counsel will see to the formation of the committee. The members will be appointed, as described in the next paragraph, for the duration of the case.

   In the event that the responding party is a full-time faculty bargaining unit member, the UHRB shall be constituted pursuant to the Faculty Procedures, attached at Appendix B. In all other cases, the UHRB shall consist of three (3) members: the Provost or the Provost's designee, as Chair, one representative from the constituency of the complaining party and one representative from the constituency of the responding party. For purposes of this complaint procedure, the constituency for a faculty member shall be the faculty (excluding department chairs and except as otherwise provided in the Faculty Procedures for full time faculty bargaining unit members), the constituency for a student shall be the Dean of Students Office, the constituency for an administrative employee shall be the administration (excluding department chairs), and the constituency for a union represented staff member (office, clerical, technical employee or maintenance employee) shall be the membership of the same collective bargaining unit. Except for proceedings pursuant to Appendix B, all faculty members shall be appointed by the Faculty Affairs Committee of the University Senate through the Senate Executive Committee. The Dean of Students shall be responsible for selecting a representative from the Dean of Students Office. All administrative employees shall be appointed by the President. All union-represented staff members shall be appointed by the appropriate union.

   Prior to the commencement of proceedings before the UHRB pursuant to Appendix A, members of the UHRB will be trained by the Equal Rights and Opportunity Officer with respect to harassment issues, current standards concerning what conduct may constitute harassment and any other specific issues necessary for determination of the complaint before them. The members of the UHRB in a proceeding pursuant to Appendix B will be trained annually

10

by the Equal Rights and Opportunity Officer with respect to harassment issues and current standards concerning what conduct may constitute harassment. The AAUP has the right to attend these training sessions.

Both the complaining party and the responding party shall be provided with a list identifying the members of the UHRB who will serve as the hearing committee. Any member of the UHRB with an interest in the matter, or who the complaining party or the responding party justifiably maintains has a conflict of interest, may be asked to disqualify himself or herself from participating in processing the complaint. Requests for disqualification should be made within five working days of receipt of the list, and should be submitted to the UHRB, which will provide a copy of such request to the other party. A UHRB member may request disqualification of himself or herself by submitting a statement to the parties and the UHRB setting forth the basis for disqualification. Any disputes concerning disqualification will be decided by the Provost or his/her designee. If a member of the UHRB is disqualified, another member shall be appointed as in the paragraph above or, where the responding party is a full-time faculty member, as in Appendix B.

Formal Complaint Proceedings Before the University Harassment Review Board: The UHRB shall commence formal proceedings for determination of the complaint promptly but no later than fifteen (15) calendar days after Step Two proceedings are initiated. This process shall include hearings before the UHRB in which the complaining party, responding party and other relevant witnesses shall have the opportunity to provide testimony and documents. At the conclusion of the hearings, the UHRB will make written findings and recommend a penalty, if applicable.

c. Hearing before the UHRB: The UHRB shall conduct hearings, which shall be governed by this Policy and, as applicable, by (a) Formal Complaint Proceedings Before the University Harassment Review Board (which applies to all responding parties, including adjunct faculty members, other than full-time faculty bargaining unit members), attached at Appendix A and (b) the Faculty Procedures where the responding party is a full-time faculty bargaining unit member, attached at Appendix B. The UHRB shall report its findings, which must be based on a preponderance of the evidence in the record considered as a whole, in writing to the President, with copies to the complaining and responding parties.

3. Step Three

*Within fifteen (15) calendar days* after receiving a copy of the UHRB's written finding either party may submit written objections to the findings with the President of the University. Such written objections should set forth, in detail, the reasons why the objecting party believes the UHRB's findings should not be affirmed, or why the recommended penalty should not be adopted, by the

11

President. A copy of the written objections will be provided to the other party in interest, who may file a written response *within fifteen (15) calendar days* after receipt of the objections.

In addition to filing written objections, either party may request a hearing before the President, which the President may grant in his discretion. The hearing may be attended by the objecting party (with one advisor), the other party (with one advisor), the President, the Equal Rights and Opportunity Officer, and the UHRB. At the hearing, each party will be permitted to present his or her position orally (limited to thirty (30) minutes), and the President may question each. These proceedings will be recorded.

*Within thirty (30) calendar days* of the submission of written objections or the hearing, whichever is later, the President shall issue his final decision, in writing. If neither party files objections to the UHRB's findings within the prescribed time period, the President will issue a final decision within *thirty (30) calendar days* after receiving the findings and recommendations. After giving due consideration to the UHRB's findings and recommendations, the President may accept or reject the findings and recommendations, including any recommendation regarding penalty.

Any penalty imposed by the UHRB or the President shall be consistent with any applicable collective bargaining agreement or disciplinary provisions with respect to union-represented employees. A copy of the decision will be provided to each party. The President's decision will be final and binding on all parties. Notwithstanding the foregoing, where the responding party is a full-time faculty bargaining unit member, the President's decision is subject to review as set forth in Appendix B.

4. Informal Resolution of Complaint Permitted

At any time during the Step Two or Step Three process, the President, the UHRB or the Equal Rights and Opportunity Officer shall have authority to enter into an informal resolution of the complaint that is acceptable to both the complaining party and the responding party. As noted above, upon the informal resolution of a complaint, the matter will be deemed closed, and no party will be permitted to appeal, contest, re-open, or otherwise attempt to set aside or amend the terms of the informal resolution as long as the terms are adhered to.

5. Extensions of Time

All of the time limits contained in the foregoing and in the attached Appendices may be extended by mutual written agreement of the party requesting the extension and the Equal Rights and Opportunity Officer (Step One), the UHRB (Step Two) or the President (Step Three).

12

6.  Harassment File

The Office of the Equal Rights and Opportunity Officer shall maintain a file of all harassment complaints and their outcomes, including harassment complaints by students against students. The UHRB or the President may inquire of the Equal Rights and Opportunity Officer whether prior cases exist in which the responding party was involved where the case resulted in a finding by the UHRB against the responding party or where the case was informally resolved in conformance with FPS 43. Additionally, the UHRB may consider for purposes of determining an appropriate penalty prior cases involving other parties that involve the same or similar conduct to that alleged in the complaint under consideration. The complainant and the responding party shall be given copies of all information provided to the UHRB in response to such a request.

7.  Independent Investigation

The University reserves the right to conduct an investigation of a complaint of harassment independent of or in addition to the procedure provided herein at any time.

## IV. Policy Review

The University Senate including representatives from the University and the AAUP shall be responsible for periodically reviewing this policy and its implementation to assess its effectiveness and make recommendations regarding possible changes. The Equal Rights and Opportunity Officer shall deliver an annual report on the activities of the Office of the Equal Rights and Opportunity Officer to the University's General Counsel.

Hu Doc 8855
Rev 9-23-2014

13

APPENDIX A

Formal Complaint Proceedings Before the University Harassment Review Board

As soon as possible, but within *fifteen (15) calendar days* after Step Two proceedings are initiated, the UHRB shall commence formal proceedings for determination of the complaint. This process should include the following steps:

1.     The Equal Rights and Opportunity Officer shall forward to the UHRB, the complaining party, the responding party, and, if the responding party is a member of a union, the responding party's union,[1] a copy of the Harassment Complaint Form ("Formal Complaint"), any written response of the responding party ("Written Response"), and this Appendix A.

2.     The UHRB should notify the responding party that it will: (a) conduct a full investigation of the complaint; (b) determine whether the alleged conduct occurred; (c) if the alleged conduct occurred, determine whether the conduct constitutes harassment in violation of the University policy; and (d) determine an appropriate penalty if warranted.

3.     The complaining party shall be provided with a full copy of the Written Response to the complaint, including any documents or other materials submitted by the responding party in support of the response.

4.     The UHRB shall commence formal proceedings for determination of the complaint promptly but no later than fifteen (15) calendar days after Step Two proceedings are initiated.  Both the complaining party and the responding party shall be notified by the UHRB of their right to be represented by advice from an attorney or any other individual of their choice in hearings before the UHRB.  There shall be no more than one (1) advisor per party present at any UHRB hearing. The parties or their advisors are not permitted to examine or cross-examine witnesses, such power being reserved exclusively to the UHRB.  The parties or their advisors may submit to the UHRB suggested questions for the UHRB to ask a particular witness, and the UHRB, in its discretion, may ask or not ask any question so submitted.  The parties or their advisors also are entitled to suggest, but not insist, that a particular witness or witnesses be called by the UHRB. The parties are permitted to raise objections to questions posed by the UHRB during the examination of a witness, or to any evidence offered for consideration by the UHRB during the course of the hearing, which objections will be considered and ruled upon by the UHRB.  Further, the parties are permitted to make opening and closing remarks to the UHRB, subject to any time limitations imposed by the UHRB in its discretion.

5.     Hearing proceedings shall be recorded by stenographic or other means, and a written transcript of the proceedings shall be made.  This transcript shall be held by the Office of the Equal Rights and Opportunity Officer.  Such transcript shall be made available only to: the complaining party, the responding party, and, if the responding party is a member of a union, the responding party's union in conformance with footnote 1, and the members of the UHRB.  The

---

[1] The responding party, if a union member, will be advised that absent his or her objection, his/her union will be notified only that a Formal Complaint has been filed.  With the responding party's consent, copies of the Formal Complaint, Written Response, and all evidence collected will also be provided to the union

cost of the transcript shall be borne by the University. Access to transcripts of the proceedings shall be conditioned upon the signing of a confidentiality stipulation by the inspecting party.

      6.     The hearing shall include to the extent possible:

          a.     *Examination of the complaining party, the responding party, and any relevant witnesses who may be of assistance in resolving the complaint.* The complaining party and the responding party and their advisors, if any, shall be informed of the identity of any relevant witness to be examined by the UHRB and shall have the right to be present during the UHRB's examination of any witness. The complaining and responding parties shall have the opportunity to rebut or otherwise comment on the witness's testimony should they so desire. Further, as provided above, either party may submit to the UHRB suggested questions for the UHRB to ask a particular witness, and the UHRB, in its discretion, may ask or not ask any question so submitted.

          b.     *Careful review of any documents and other information submitted by the parties or witnesses, or any other documents and information the UHRB may deem relevant.* The complaining party and the responding party should be provided copies of all documents and information considered by the UHRB during the course of the hearing, and shall be permitted to comment on such evidence should they so desire.

      7.     The complaining party and the responding party shall have the right to submit to the UHRB, throughout the hearing process, any additional relevant documents, information or witnesses they believe necessary to support their position.

      8.     At any time during the hearing process, either party may request from the UHRB documents or information in the possession or custody of the University that he or she believes is essential for prosecuting or defending the complaint. The request should be in writing and should specify with reasonable particularity the documents or information sought. The UHRB shall comply with the request unless it appears that the request is unduly burdensome, overly broad, or not relevant to determining the issues raised by the complaint. If the request involves confidential documents or information, the University shall have the right to require the parties to enter into a confidentiality stipulation agreeing not to disclose such documents or information outside the confines of the complaint process, prior to producing such confidential materials.

      9.     UHRB hearings shall be closed, and may only be attended by the complaining party (and his or her advisor), the responding party (and his or her advisor), and, if the responding party is a member of a union, the responding party's union (which may include a union representative and/or the union's counsel) in conformance with footnote 1, the members of the UHRB, testifying witnesses, counsel for the UHRB, and personnel necessary for administration of the hearing. The parties and their advisors have a right to be present throughout the hearing. However, testifying witnesses may only be present for their own testimony.

      10.     The UHRB shall not be bound by technical rules of evidence, but may consider any relevant, material, and reliable evidence that it believes will contribute to an informed result. Further, the UHRB shall have discretion in deciding which evidence to accept and how much

weight should be accorded particular documents or testimony. Subject to the procedures prescribed herein, the UHRB may establish its own rules regarding procedural matters, including but not limited to the order of testimony and presentation, scheduling, adjournments, and communication with the UHRB.

11.     If the UHRB finds related misconduct that does not constitute harassment, the UHRB shall refer the matter to the University Administrator responsible for addressing such issues.

12.     The UHRB shall provide a copy of its written finding to the complaining party, the responding party and, if the responding party is a member of a union, the responding party's union, and the President. If applicable, the finding should include a recommended penalty. The UHRB may recommend any penalty that it deems appropriate under the circumstances, including, but not limited to, administrative actions such as a written warning, probationary status, suspension or dismissal, or expulsion.

13.     If the UHRB finds that the complaining party has been intentionally dishonest, malicious or frivolous in making the allegations, the UHRB shall, after consultation with the Equal Rights and Opportunity Officer, recommend an appropriate penalty.

Hu Doc 8958
Rev 9-23-2014

3

APPENDIX B

FACULTY PROCEDURES FOR HARASSMENT COMPLAINT PROCEEDINGS BEFORE
THE UNIVERSITY HARASSMENT REVIEW BOARD

The following procedures apply to all disciplinary actions brought against bargaining unit
members for alleged violations of FPS 43 last revised September 23, 2014:

1. <u>Adequate Cause Requirement.</u> Bargaining unit members may not be disciplined without
   adequate cause relating, directly and substantially, to the fitness of the member in his/her
   professional capacity as teachers, librarian or researcher. Discipline includes but is not
   limited to a written warning, suspension or termination. Discipline will not be used to
   restrain bargaining unit members in their exercise of academic freedom or other rights of
   American citizens.

2. <u>Service of Charge Statement.</u> The Harassment Complaint Form (hereinafter referred to
   as "Formal Complaint"), as prepared by the complaining party, framed with reasonable
   particularity, will be served on the full-time faculty responding party (such full-faculty
   bargaining unit member hereinafter referred to as "responding party") and the AAUP in
   conformance with footnote 1 below.[1] The responding party will also be provided with
   copies of any other evidence collected during the initial investigation. The complaining
   party (if not the University) will also be provided with all evidence collected during the
   initial investigation, including any statements submitted by the responding party.
   Documents submitted in efforts to reach an informal settlement are not part of the hearing
   record.

3. When Step Two proceedings are initiated in accordance with FPS 43, the responding
   party and the AAUP will be notified by the University. If the responding party did not
   submit a written response to the complaint at an earlier stage of the investigation or
   wishes to supplement his/her response s/he may do so within ten (10) days of notification
   of the initiation of Step Two.

4. (a) The UHRB shall consist of five (5) members: The Provost or the Provost's designee ,
   who shall serve as Chair; the Vice President for Student Affairs or a designee; two (2)
   tenured faculty members selected from a standing pool, as described below; and one (1)
   person selected from the joint administrative/tenured faculty pool, as described below.
   The Provost's designee shall have the title provost or dean and the designee of the Vice
   President for Student Affairs shall be from the Office of Student Affairs and have a title
   at the director level or above.

   (b) The tenured faculty pool shall consist of a standing group of six (6) tenured faculty
   members, with faculty in the standing group assigned in random rotating order
   established after the standing group is selected. Unless the parties agree to an alternative
   method of joint selection, the standing group shall be selected through a mechanism

---

[1] The responding party will be advised that absent his or her objection, the AAUP will be notified only that a
Formal Complaint has been filed. With the responding party's consent, copies of the Formal Complaint and all
evidence collected will also be provided to the AAUP.

1

whereby the University Administration and the AAUP each submit a list of proposed tenured faculty members in an agreed upon number to a neutral third party; any overlapping names shall constitute the standing group; and if the standing group is not then sufficient in number, the neutral party shall request that the University Administration and the AAUP each numerically rank the remaining names on the two lists, with each party having the right to veto any name on the other party's list; the faculty members with the highest combined rankings shall serve as the standing group of six (6) faculty. The neutral third party may ask each party to submit additional names until the standing group of six (6) is established.

(c) The joint administrative/tenured faculty pool shall consist of three (3) administrators and three (3) tenured faculty. The pool shall be selected in the same manner as for the tenured faculty pool. The designee to a particular UHRB panel shall alternate between an administrator and a faculty member on a case-by-case basis, so that every other hearing includes either an administrator or a faculty member. The designee in the first hearing will be selected randomly and panelists thereafter shall be assigned in random rotating order. The designees shall also rotate from within the same classification; i.e. administrators serve in rotating order in every other UHRB panel and faculty serve in rotating order in every other panel. If a participant is disqualified or unable to serve, he or she shall be replaced by a member of the same constituency.

(d) The details of the selection process whereby the UHRB is constituted shall be completely confidential. All appointees must commit to serve for one full academic year and may be reappointed.

(e) When a UHRB panel is constituted, there shall be due regard for the diversity of the panel, ensuring that representatives from both genders serve on any given UHRB panel.

5. <u>Disqualification Procedures.</u> Members of the UHRB who deem themselves disqualified for bias or interest will remove themselves from the case, either at the request of a party or on their own initiative as set forth in FPS 43. No individual who has been involved in the investigation of the charge may serve on the UHRB. No faculty member from the same department as the responding party shall serve on the UHRB.

6. <u>Pre-Hearing Meetings.</u> The UHRB may, with the consent of the parties concerned, hold joint pre-hearing meetings with the parties in order to (i) simplify the issues, (ii) effect stipulations of facts, (iii) provide for the exchange of documentary or other information, and (iv) achieve such other appropriate pre-hearing objectives as will make the hearing fair, effective, and expeditious.

7. <u>Hearing Date and Notice.</u> The hearing will be scheduled on a date that is mutually acceptable to all parties within the timeframe set forth in FPS 43. Service of notice of hearing with specific charges in writing will be made on the responding party, the complaining party (if not the University) and the AAUP in conformance with footnote 1 above, at least ten (10) days prior to the hearing. The parties may waive a hearing by mutual consent. If the parties waive the hearing, the UHRB will rest its recommendation upon the evidence in the record.

8. <u>Private Hearing.</u> The hearing will be private, however the President or Grievance Officer of the AAUP and counsel to the AAUP will have the right to attend the hearing, unless the responding party objects. In the event that the AAUP does not represent the responding party in this proceeding, the responding party is entitled to have a representative at the hearing. The representative may be an attorney or any other individual of their choice. The complaining party is also entitled to have a representative at the hearing. The representative may be an attorney or any other individual of their choice. The University's counsel will serve as counsel to the UHRB.

9. <u>Transcript.</u> Hearing proceedings shall be recorded by stenographic or other means, and a written transcript of the proceedings shall be made. Subject to the signing of a confidentiality stipulation, the transcript shall be made available only to: the complaining party; the responding party; their representatives; the AAUP in conformance with footnote 1 above; and any member of the UHRB. The cost of the transcript shall be borne by the University.

10. <u>Burden of Proof.</u> The following burden of proof rests with the complaining party. The complaining party must establish that the responding party violated the University's Harassment Policy based on a preponderance of the evidence in the record considered as a whole.

11. <u>Adjournments.</u> The UHRB will grant adjournments to enable either party to investigate evidence as to which a valid claim of surprise is made.

12. <u>Opportunity to Obtain Evidence.</u> The parties will be afforded an equal opportunity to obtain necessary witnesses and documentary or other evidence. The Administration will cooperate with the UHRB in securing witnesses and making available documentary and other evidence.

13. <u>Examination.</u> The parties will be afforded equal rights, through the UHRB, to examine witnesses, cross-examine witnesses, and submit evidence. The parties may propose all of the questions that they wish to ask witnesses to the UHRB, including follow up questions. The Chair of the UHRB will pose those questions. Subject to the procedures prescribed herein, the UHRB may establish its own rules regarding procedural matters, including but not limited to the order of testimony and presentation, scheduling, adjournments, and communication with the UHRB.

14. <u>Rules of Evidence.</u> The UHRB will not be bound by strict rules of legal evidence, and may admit any evidence which is of probative value in determining the issues involved. Every possible effort will be made to obtain the most reliable evidence available.

15. <u>Findings Based on Record.</u> The UHRB's findings of fact and decision will be based solely on the hearing record. Statements made by a party during settlement discussions or in efforts to informally resolve the matter are inadmissible in the UHRB proceeding and may not be shared with or considered by the UHRB.

16. <u>Confidentiality.</u> It is the policy of Hofstra University to protect the confidentiality of members of the University community who may be involved in harassment complaint procedures, insofar as that is reasonably practicable. Except for such simple announcements as may be required, covering the time of the hearing and similar matters, public statements and publicity about the case by any party or administrative officers will

3

be avoided so far as possible. The responding party and the complaining party (if not the University) and the AAUP will be notified of the decision in writing.

17. <u>Step Three.</u> The determinations of the UHRB, of whether the harassment policy was violated and the recommended penalty, will be submitted to the President. Either party may submit written objections to the findings with the President pursuant to the procedures set forth in Step Three of FPS 43. In the event the President grants a hearing pursuant to FPS 43, the AAUP may attend in addition to those noted in FPS 43 unless the responding party objects. In the event that the President disagrees with the recommendation of the UHRB s/he will state the reasons for doing so in writing. The President's final decision shall be provided to both parties and the AAUP.

18. <u>Arbitration.</u> If either party or the AAUP disagrees with the decision of the President, that party or the AAUP may appeal to arbitration. The standard for review by an Arbitrator will be that the President (a) acted in an arbitrary or capricious manner; (b) failed to apply the written criteria of the University; or that (c) the procedural due process to which either party was entitled under the Collective Bargaining Agreement or any other applicable policies or laws were violated. The demand for arbitration must be filed pursuant to the rules of the American Arbitration Association in accordance with its Voluntary Labor Rules then in effect, and by serving the other party with a copy of the demand for arbitration. The demand for arbitration must be filed and served no later than thirty (30) days after the issuance of the President's final decision. The costs of such arbitration shall be shared by the parties.

19. The AAUP and the University reserve all rights and arguments with regard to the precedential value of any resolutions or determinations made pursuant to these procedures and FPS 43 in which the AAUP was not a participant.

20. The paragraphs above apply only to FPS 43 proceedings brought against full-time AAUP members. Proceedings brought against adjunct faculty alleging violations of FPS 43 will be governed by FPS 43 and Appendix A to FPS 43. An adjunct may not be de-listed on the basis of alleged violations of FPS 43 until the Appendix A and FPS 43 procedures are completed.

Hu Doc 8852
Rev 9-23-2014

# Exhibit C

EEOC Form 161 (11/09)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION ("EEOC")

### DISMISSAL AND NOTICE OF RIGHTS

| To: | From: |
|---|---|
| ▓▓▓▓▓▓ c/o Menaker & Herrmann, LLP 10 East 40th Street New York, NY 10016-0301 | New York District Office 33 Whitehall Street – 5th Floor New York, NY 10004 |

| ☐ | On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a)) | |

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **520-2017-01751** | Patrick Sanford, Federal Investigator | (212) 336-3677 |

THE EEOC IS CLOSING ITS INVESTIGATION OF THIS CHARGE OF DISCRIMINATION ("CHARGE") FOR THE FOLLOWING REASON:

☐ The facts alleged in the Charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ The allegations in the Charge did not involve a disability as defined by the Americans with Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your Charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your Charge

☒ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the Respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this Charge.

☐ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this Charge.

☐ Other:

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

*(signature)*                                                          MAY 30 2017

Kevin J. Berry,                                                    *(Date Mailed)*
District Director

Enclosures(s)

cc:  **Respondent:**
Hofstra University
Attn: Office of Legal Affairs
144 Hofstra University
Hempstead, NY 11549

**Charging Party's Attorney:**
Menaker & Herrmann, LLP
Attn: Cheryl Davis, Esq.
10 East 40th Street
New York, NY 10016-0301
(212) 545-1900

Enclosure with EEOC
Form 161 (11/09)

### INFORMATION RELATED TO FILING SUIT
### UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court <u>under Federal law</u>.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS** -- **Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days** of the date you *receive* this Notice. Therefore, you should **keep a record of this date.** Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *mailed* to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS** -- **Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than <u>2 years (3 years)</u>** before you file suit may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit before 7/1/10 — not 12/1/10 -- in order to recover unpaid wages due for July 2008. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice <u>and</u> within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION** -- **Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do <u>not</u> relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE** -- **All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request <u>within 6 months</u> of this Notice.** (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

# Exhibit D to Davis Declaration

MENAKER & HERRMANN
A LIMITED LIABILITY PARTNERSHIP
10 EAST 40ᵀᴴ STREET
NEW YORK, NEW YORK 10016-0301

TELEPHONE
(212) 545-1900

FACSIMILE
(212) 545-1656

WEBSITE
www.mhjur.com

CHERYL L. DAVIS
EXTENSION: 222
cdavis@mhjur.com

October 20, 2017

By Overnight Mail and ECF

Hon. Gary R. Brown, U.S.M.J.
United States Courthouse
100 Federal Plaza, P.O. Box 9014
Central Islip, NY 11722-9014
Courtroom 840

Re:   A.B. v. Hofstra University (2:17-cv-05562-SJF-GRB)

Dear Judge Brown:

We represent plaintiff A.B. and respectfully submit this letter motion under your Honor's Rule III(B) and Judge Feuerstein's Rule 4 to consolidate this case with two related cases pursuant to F.R.C.P. 42(a) and to seal the record or, in the alternative, to continue to use the existing pseudonyms in the case from state court.

Plaintiff brought this action for gender discrimination under state and federal law in New York State Supreme Court, Queens County, following issuance of a right to sue letter by the EEOC. Defendant removed the case to this Court on September 22, 2017. The complaint alleges that Hofstra University ("Hofstra") officials discriminated against plaintiff by terminating his employment as Hofstra's varsity tennis coach based on false statements by a student athlete ("Jane Doe"), who attempted to extort an increase in her scholarship by claiming sexual harassment. The alleged facts support a discrimination claim under the Second Circuit's standard in *John Doe v. Columbia University* 831 F.3d 46 (2d Cir. 2016).

Two closely related civil actions are also pending before judges of this Court. Plaintiff brought a related action for defamation against Jane Doe based on her false allegations, also in state court. That action (*A.B. v. C.D.*, 2:17-cv-05840, the "Defamation Case") was recently removed to the E.D.N.Y. and has been assigned to Judge Seybert. In a separate action, the existence of which has just come to our attention, Jane Doe, defendant in the Defamation Case, has sued Hofstra in the E.D.N.Y. for Title IX discrimination, naming plaintiff as a non-party. That case (*Jane Doe v. Hofstra University*, 2:17-cv-00179, the "Jane Doe Case") is currently before Judge Hurley. These three cases share the same set of operative facts (Jane Doe's accusations and Hofstra's response), involve the same parties and entities (plaintiff, Jane Doe and Hofstra), and raise the same common questions of fact (were Jane Doe's accusations true and did Hofstra respond appropriately?). Plaintiff filed a similar motion in the Defamation

Hon. Denis R. Hurley, U.S.D.J.
October 20, 2017
Page 2

Case and a motion to intervene in the Jane Doe Case. These motions are attached hereto.[1]

## I.      Consolidation is Warranted.

Consolidation of related cases is expressly authorized by F.C.R.P. 42(a). *Maggio v. Leeward Ventures, Ltd.*, 939 F.Supp. 1020 (E.D.N.Y. 1996). Consolidation is favored where two or more cases have the same parties and common facts and common legal issues, because of the benefits in saved judicial resources and economy for the parties, consistent with the mandate of F.R.C.P. 1. *Bank of Montreal v. Eagle Assocs.*, 117 F.R.D. 530, 532 (S.D.N.Y. 1987). Consolidation also eliminates the potential for inconsistent rulings on identical issues. *Id.* at 533.

The test for consolidation turns "on whether the common fact and law issues indicate that there would be a sufficient saving of time and effort on the part of the court and the parties to warrant a joint trial, when balanced against the inconvenience, delay or expense to the parties that might result from requiring each to attend trial of some issues in which it is not involved." *Stein, Hall & Co. v. Scindia Steam Nav. Co.*, 264 F. Supp. 499, 501 (S.D.N.Y. 1967). Consolidation here would cut judicial expense by eliminating two dockets and would materially reduce party costs. No factors mitigate against consolidation:

(a)      The potential for delay is minimal. This case and the Defamation Case were recently removed and have just started; no discovery has been exchanged or requested, and no conferences have been held. The Jane Doe Case has a short docket of only thirteen entries, covering merely the complaint, answer, and a motion to seal or proceed pseudonymously, which was granted.

(b)      There is no likelihood of confusion; in fact, consolidation would eliminate the risk for confusion since keeping the cases separate could produce contradictory results.

(c)      There is no likelihood of prejudice. All cases are in the same district, causing no party or witness any additional burden or cost.

## II.      Proceeding Pseudonymously is Warranted

Judge Hurley has already granted permission to the plaintiff in the Jane Doe Case to proceed pseudonymously, and plaintiff in this case proceeded anonymously when filing his action in Queens County. The case should be accorded the same treatment in this Court.

F.R.C.P. 10(a) states that "[t]he title of [a] complaint must name all the parties," but "[c]ourts have nevertheless 'carved out a limited number of exceptions to the general requirement of disclosure [of the names of parties] which permit plaintiffs to proceed anonymously.'" *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 189 (2d Cir. 2008) (internal

---

[1] While plaintiff has no preference as to which of the three cases should be the lead case, it may make sense to consolidate the other cases with the Jane Doe Case since the Jane Doe Case was filed first, in January 2017.

Hon. Denis R. Hurley, U.S.D.J.
October 20, 2017
Page 3

citation omitted). These exceptions include instances such as the ones faced here, where plaintiff
fears physical or mental retaliation as a consequence of asserting a substantive legal right (here
the right to sue for defamation), where publicizing plaintiff's name will exacerbate the harm
plaintiff has already suffered, and where innocent nonparties (such as plaintiff's wife and
stepchildren) would be harmed.

The Second Circuit in *Sealed Plaintiff* set out factors for this balancing test, the
majority of which weigh in favor of allowing plaintiff to proceed anonymously. *Id.* at 190. A
plaintiff's interest in anonymity must be weighed against "both the public interest in disclosure
and any prejudice to the defendant." *Id.* at 189; *see also John Doe v. Columbia Univ.*, 831 F.3d
46 (2d Cir. 2016) (plaintiff brought suit against university for violation of Title IX by
demonstrating sex bias against him in the way in which it investigated a claim of alleged sexual
assault); *Doe v. Univ. of Conn.*, 2013 WL 4504299 (D. Conn. Aug. 22, 2013) (permitting both
plaintiff and defendant to proceed anonymously in a case alleging sexual harassment).

Here, plaintiff has a significant interest in being allowed to proceed anonymously
since harm to his reputation from Jane Doe's false statements would be magnified if made even
more broadly public. In addition, he has a well-founded fear of retaliation from defendant's
father, who has previously threatened plaintiff (Compl. ¶11). Plaintiff's claim includes important
legal issues that do not require that the parties' identities be public knowledge, while the fact
issues have no public import. Since defendant knows plaintiff's identity, her ability to take
discovery will remain unimpaired. Defendant has falsely claimed that plaintiff made
inappropriate statements about his marital status and grotesque remarks about female body
functions. Publicizing these statements could cause harm to plaintiff's spouse and stepchildren.
*See, e.g., Sealed Plaintiff* at 190; *Smith v. Edwards*, 175 F.3d 99, 99 n. 1 (2d Cir. 1999) ("For the
sake of the privacy of plaintiff's child, pseudonyms for plaintiff and his family are employed
throughout this opinion.").[2]

For these reasons plaintiff's motion to consolidate and to seal or to continue use
of pseudonyms should be granted.

Respectfully yours,

Cheryl L. Davis

Enclosures

cc:    Jill L. Rosenberg, Esq., attorney for Hofstra University (by email and ECF)
       David S. Schwartz, Esq., attorney for Jane Doe (by email)

---

[2] The matter in these cases has so far received only limited media attention. An order to seal and/or proceed
pseudonymously would limit any damage likely to occur in the future.

# Exhibit E to Davis Declaration

JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| A.B. | Hofstra University |

| (b) County of Residence of First Listed Plaintiff    Queens County | County of Residence of First Listed Defendant    Nassau County |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)* |
| | NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED. |

| (c) Attorneys *(Firm Name, Address, and Telephone Number)* | Attorneys *(If Known)* |
|---|---|
| Menaker & Herrmann LLP<br>10 East 40th Street, 25th Floor, New York, NY 10016 | Orrick, Herrington & Sutcliffe LLP<br>51 West 52nd Street, New York, NY 10019 |

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**TORTS**

*PERSONAL INJURY*
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury - Medical Malpractice

*PERSONAL INJURY*
- ☐ 365 Personal Injury - Product Liability
- ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

*PERSONAL PROPERTY*
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**FORFEITURE/PENALTY**
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Management Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Retirement Income Security Act

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 835 Patent - Abbreviated New Drug Application
- ☐ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 375 False Claims Act
- ☐ 376 Qui Tam (31 USC 3729(a))
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Information Act
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**CIVIL RIGHTS**
- ☐ 440 Other Civil Rights
- ☐ 441 Voting
- ☒ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 448 Education

**PRISONER PETITIONS**

*Habeas Corpus:*
- ☐ 463 Alien Detainee
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty

*Other:*
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee - Conditions of Confinement

**IMMIGRATION**
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☐ 1 Original Proceeding
- ☒ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

| VI. CAUSE OF ACTION | Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:<br>42 U.S.C. §§ 2000e, et seq.<br>Brief description of cause:<br>Claim under Title VII of the Civil Rights Act of 1964 for gender discrimination |
|---|---|

| VII. REQUESTED IN COMPLAINT: | ☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P. | DEMAND $ | CHECK YES only if demanded in complaint:<br>JURY DEMAND: ☐ Yes ☒ No |
|---|---|---|---|

| VIII. RELATED CASE(S) IF ANY | *(See instructions):* | JUDGE   Hurley | DOCKET NUMBER   2:17-cv-00179-DRH-AYS |
|---|---|---|---|

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| 09/22/2017 | /s/ Jill L. Rosenberg |

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

## CERTIFICATION OF ARBITRATION ELIGIBILITY

Local Arbitration Rule 83.10 provides that with certain exceptions, actions seeking money damages only in an amount not in excess of $150,000, exclusive of interest and costs, are eligible for compulsory arbitration. The amount of damages is presumed to be below the threshold amount unless a certification to the contrary is filed.

I, _____, counsel for _____, do hereby certify that the above captioned civil action is ineligible for compulsory arbitration for the following reason(s):

☐ monetary damages sought are in excess of $150,000, exclusive of interest and costs,

☐ the complaint seeks injunctive relief,

☐ the matter is otherwise ineligible for the following reason

### DISCLOSURE STATEMENT - FEDERAL RULES CIVIL PROCEDURE 7.1

Identify any parent corporation and any publicly held corporation that owns 10% or more or its stocks:

None

### RELATED CASE STATEMENT (Section VIII on the Front of this Form)

Please list all cases that are arguably related pursuant to Division of Business Rule 50.3.1 in Section VIII on the front of this form. Rule 50.3.1 (a) provides that "A civil case is "related" to another civil case for purposes of this guideline when, because of the similarity of facts and legal issues or because the cases arise from the same transactions or events, a substantial saving of judicial resources is likely to result from assigning both cases to the same judge and magistrate judge." Rule 50.3.1 (b) provides that " A civil case shall not be deemed "related" to another civil case merely because the civil case: (A) involves identical legal issues, or (B) involves the same parties." Rule 50.3.1 (c) further provides that "Presumptively, and subject to the power of a judge to determine otherwise pursuant to paragraph (d), civil cases shall not be deemed to be "related" unless both cases are still pending before the court."

### NY-E DIVISION OF BUSINESS RULE 50.1(d)(2)

1.) Is the civil action being filed in the Eastern District removed from a New York State Court located in Nassau or Suffolk County: no

2.) If you answered "no" above:
a) Did the events or omissions giving rise to the claim or claims, or a substantial part thereof, occur in Nassau or Suffolk County? yes

b) Did the events or omissions giving rise to the claim or claims, or a substantial part thereof, occur in the Eastern District? yes

If your answer to question 2 (b) is "No," does the defendant (or a majority of the defendants, if there is more than one) reside in Nassau or Suffolk County, or, in an interpleader action, does the claimant (or a majority of the claimants, if there is more than one) reside in Nassau or Suffolk County?
(Note: A corporation shall be considered a resident of the County in which it has the most significant contacts).

### BAR ADMISSION

I am currently admitted in the Eastern District of New York and currently a member in good standing of the bar of this court.
☒ Yes ☐ No

Are you currently the subject of any disciplinary action (s) in this or any other state or federal court?
☐ Yes (If yes, please explain) ☒ No

I certify the accuracy of all information provided above.

**Signature**:_____ /s/ Jill L. Rosenberg _____

# Exhibit F to Davis Declaration

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

-------------------------------------------------------------X

JANE DOE[1],

               Plaintiff,

    - against -

HOFSTRA UNIVERSITY,

               Defendant.

-------------------------------------------------------------X

Case No. 2017 JAN 13 AM 10: 18

CV 17 0179

**COMPLAINT**    HURLEY, J.

SHIELDS, M.J.

**PLAINTIFF DEMANDS**
**A TRIAL BY JURY**

      Plaintiff, proceeding pseudonymously as Jane Doe, by her attorneys, Phillips & Associates, Attorneys at Law, PLLC, hereby complains of the Defendant, Hofstra University, and alleges as follows:

### NATURE OF THE CASE

      1.     This is an action for unlawful discrimination (sexual harassment and quid pro quo harassment) and retaliation under Title IX of the United States Education Amendments of 1972, 20 U.S.C. § 1681 *et seq* ("Title IX"), and for Negligent Retention and Negligent Supervision under New York law.  The Plaintiff, a female student at Hofstra University and a member of the University's tennis team, was subjected to unwelcome and unwarranted sexual harassment from her male tennis coach,       . After rejecting       sexual advances, the Plaintiff was immediately subjected to adverse actions by her harasser. The Plaintiff complained of the harassment to the University, and was then subjected to further retaliation. By this action Plaintiff demands all remedies available in law and equity. Plaintiff demands a trial by Jury.

---

[1] Plaintiff has concurrently filed with this Complaint a motion requesting leave to proceed pseudonymously or, in the alternative, for an order sealing the complaint.

## JURISDICTION AND VENUE

2.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331, because this action arises under the laws of the United States.

3.     This Court has venue over this action pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

4.     This Court has supplemental jurisdiction over the Plaintiff's state law claims pursuant to 28 U.S.C. § 1367, because the Plaintiff's federal and state law claims derive from a common nucleus of operative facts and form part of the same case or controversy under Article III of the United State Constitution.

## PARTIES

5.     Plaintiff **Jane Doe** is a citizen of Ontario, Canada.  She is an undergraduate student at Hofstra University.  During the school year, Plaintiff Doe resides in Hempstead, NY, on the campus of Hofstra University.  Plaintiff Doe is female.

6.     Defendant **Hofstra University** ("Hofstra" or "the University") is a private college located at 1000 Fulton Avenue, Hempstead, NY 11549.

7.     Hofstra receives Federal Financial Assistance within the meaning of Title IX.

## FACTUAL ALLEGATIONS

8.     Plaintiff Doe began her freshman year at Hofstra in September 2015.  She was 18 years old at the time.

9.     Hofstra participates in Division 1 Athletics through the National Collegiate Athletic Association ("NCAA") and maintains male and female tennis teams.

10.     Plaintiff Doe was recruited to play tennis for Hofstra by Hofstra's former tennis coach, Lauren Leo.  Plaintiff Doe was awarded a scholarship at 80% of her tuition in part to play

tennis for the University. Ms. Leo promised Plaintiff Doe that Plaintiff's scholarship would increase to 100% of her tuition after Plaintiff's freshman year.

11.     Upon arriving on campus for the beginning of her freshman year, Plaintiff Doe was filled with the excitement and nervousness experienced by thousands of new college freshman throughout the country every year. Plaintiff Doe was excited to meet her new tennis teammates and participate in the sport that she had loved since she was a child.

12.     Unfortunately, everything changed when Ms. Leo left the University, and

was hired to be the new tennis coach for both the men's and women's teams. From the moment he was hired,                began to engage in a pattern of unlawful, degrading, and humiliating sexual harassment towards Plaintiff Doe.

13.     In or around January 2016, Mr. Menaker "friended" Plaintiff Doe on Facebook. While Plaintiff Doe found this odd, at the time she did not give the action much thought.

14.     Subsequently, Plaintiff Doe posted a picture on Facebook of herself standing in front of the large red "LOVE" statue in New York City. At 12:30 a.m. on Valentines Day,

commented on the picture on Facebook, stating, "looks like you found what you were hunting for in that jacket" and added a winking emoji face icon at the end of his comment. This unwarranted and unwelcome comment made Plaintiff Doe feel degraded and uneasy.

15.                then suddenly took on an odd obsession with Plaintiff Doe's menstrual cycle.                repeatedly made comments to Plaintiff Doe and her teammates about when Plaintiff Doe was getting her period. On one such occasion,                commented to one of Plaintiff Doe's teammates that the Plaintiff seemed "sluggish" at practice and that "it must be because she is on her period" because "she is supposed to be getting it around this time."

3

These comments by                          left Plaintiff Doe feeling extremely uncomfortable, anxious, and violated.

16.     Not satisfied with just talking about Plaintiff Doe's menstrual cycle, also began to comment on Plaintiff Doe's appearance.                          told Plaintiff Doe and the other female students that when they are out in public they must "shave their legs and dress nice."

17.     Upon information and belief, administration officials at Hofstra were aware of the sexual comments being made by                          . However, nothing was ever done by the University to protect their students from such conduct.

18.     During a tennis tournament in the Spring of 2016 between Hofstra and Coppin State,                          stated to Plaintiff Doe that one of the female players on the other team "winked at him." He then exclaimed to Plaintiff Doe that the female player was "good looking." These comments by                          about the physical appearance of another female tennis student-athlete heightened Plaintiff Doe's anxiety towards

19.     At a subsequent tennis tournament against The University of Delaware, began to scream obscenities and verbal harassment at a female player on the opposing team.                          conduct towards this female player was so disturbing that the parent of the player called Jeffrey Hathaway, Vice President and Director of Athletics at Hofstra, to complain about                          conduct towards female players. However, once again no action was taken by the University to correct                          behavior.

20.     In or around late March 2016, Plaintiff Doe spoke with                          about increasing her scholarship amount to 100% as former coach Leo had promised her. responded that Plaintiff Doe was having an extremely successful season, and that nobody deserved

4

the scholarship increase more than her.                    promised Plaintiff Doe that her scholarship

would be increased for her sophmore year.

21.     However, things ultimately came to a head on or about April 6, 2016 when

sent a private Facebook message to Plaintiff Doe which contained a Youtube video titled

"Casually Explained: Is She Into You?" This 2 minute 31 second video features various cartoon

depictions of increasingly sexual situations while a narrator describes how to tell if a girl is "into

you" in these different situations. The video starts by describing whether a girl who "looks at you

at a bar" is "into you" and then becomes more graphic. The video next describes a scenario of

physical touching in the workplace, and the narrator again asks if this would mean that a girl is

"into you." The video moves on to a scenario where a male and a female are exercising in the

same gym and the female winks at the male. Again, the video deliberates whether the "girl is into

the guy" in this situation. The video then goes into the scenario of two friends talking about their

last few "dates." Finally, the video talks about a scenario where a woman invites a man "upstairs,

dims the lights, rips off her clothes, and you start having sex," and includes a cartoon depiction of

two people having sex. The video finally ends stating that you can't tell if the woman having sex

is "into" the man because "she might be Canadian and just be being polite."

22.     sent Plaintiff a comment with the video in which he stated, "Last part

is the best. Maybe she's from Canada! I fell off my chair."

23.     Plaintiff Doe is from Canada.

24.     sent this video and message to Plaintiff Doe shortly after their

conversation regarding her scholarship.

25.     Plaintiff Doe felt extremely offended, humiliated, and frightened upon receiving

this video. It was clear to Plaintiff Doe that                    was asking Plaintiff Doe if she was "into

5

him." Furthermore,                    made a direct correlation between the woman in the video, who

was having sex with the male narrator, being Canadian, and Plaintiff Doe being Canadian.

   26.    Plaintiff Doe and                had never casually exchanged videos or other types

of media prior to                sending this video.

   27.    After receiving the video, Plaintiff Doe attempted to remain cordial around

   but she did not reciprocate his obvious sexual advances.

   28.    Roughly one week after sending Plaintiff Doe this video,                    behavior

towards Plaintiff Doe completely changed.

   29.    Prior to sending Plaintiff Doe this video,                    never threatened Plaintiff

Doe's scholarship or position on the team.

   30.    However, after Plaintiff Doe did not give into                    advances,

   suddenly began exclaiming that he was going to "get girls" that were "better than her."

       then also began telling Plaintiff Doe that he was no longer going to increase her

scholarship. Nothing had changed in between the time when                    stated he would

increase her scholarship to the time when he stated he would not increase it except his sending

Plaintiff Doe the video and her not acquiescing.

   31.    Not satisfied with simlpy threatening Plaintiff Doe's position on the team and her

promised scholarship increase,                    then began to tell Plaintiff Doe that her entire

scholarship for the following year was now in doubt, and that he was going to place her on a lower

position on the team.

   32.    Statistically, during the 2015-2016 school year, Plaintiff Doe was one of the top

two players on the tennis team. There was no legitimate, non-discriminatory reason why she would

be threatened with being moved to a lower position on the team.

6

33.                had the authority to remove Plaintiff from the tennis team.

had the authority to affect Plaintiff's positioning on the tennis team. Upon information and belief,                had the authority to raise, lower, or eliminate Plaintiff's athletic scholarship.

34.                hostile treatment shortly after sending the harassing video was directed solely at Plaintiff Doe. No other female students suddenly had their team position or scholarship threatened.

35.                conduct constituted unlawful quid pro quo harassment.

36.     Plaintiff Doe became so distraught by the harassment that she considered transferring schools, and went so far as to begin filling out transfer applications. However,

purposefully delayed processing Plaintiff's Doe's transfer request, such that by the time it was completed Plaintiff Doe no was no longer within the window of time allowable to transfer to another school's athletic program. Upon information and belief,                delayed Plaintiff Doe's transfer request for no other reason than to retaliate against her for refusing his sexual advances.

37.     In or about late July 2016, Plaintiff Doe notified Hofstra of the sexual harassment to which she had been subjected to by                . Hofstra, through General Counsel Jennifer Mone and Title IX Coordinator Lara Nochomovitz, acknowledged receiving Plaintiff's complaint.

38.     Upon information and belief, both Ms. Mone and Ms. Nochomovitz had the authority to institute corrective measures on behalf of the University.

39.     Upon information and belief,                was made aware by Hofstra of Plaintiff Doe's complaints and that Hofstra would be conducting an investigation into Plaintiff's complaints.

7

40.　　　　　　　then began to retaliate against Plaintiff Doe by contacting various student-athletes on both the men's and women's tennis teams and telling them of Plaintiff's complaint, and then telling them that Plaintiff Doe was a liar, that Plaintiff Doe was only looking for a scholarship, and other derogatory comments about Plaintiff Doe. These actions by

　　　　were done maliciously and solely in retaliation for Plaintiff Doe's Title IX complaints.

41.　　　　　　　then also began contacting Plaintiff's Doe's teammates and asking them if they had been in touch with Plaintiff.　　　　asked one of Plaintiff Doe's teammates if she had "spoken to a lawyer."

42.　Plaintiff made Hofstra officials, including Ms. Mone, aware of retaliatory conduct.

43.　Throughout August and September 2016, various members of the tennis team approached Plaintiff Doe and asked her "what was going on" with her and　　　　. Plaintiff Doe did not tell any teammates or any other students about the complaints she had made, as she had wanted them to be confidential. Upon information and belief,　　　　told various students and team members that Plaintiff Doe had made a complaint against him.

44.　Various teammates of Plaintiff Doe began to ostracize her after hearing these comments by　　　　, as, upon information and belief, they feared interacting with Plaintiff Doe would cause　　　　to retaliate against them as well. This caused Plaintiff Doe emotional anguish, and severely limited her ability to fully participate in and enjoy her collegiate experience.

45.　Hofstra failed to adequately protect Plaintiff Doe from retaliation after she made her Title IX complaint.

8

46.     Hofstra continued to employ                    for a period of time despite notice of both his sexual harassment and retaliatory conduct. During this time, Plaintiff Doe was forced to suffer continued acts of retaliation and harassment by                    .

47.     In or around September 7, 2016, Hofstra terminated                    .

48.     On September 7, 2016, Mr. Hathaway held a meeting with the tennis teams and stated that                    had "decided to leave." This fabrication would have been innocuous had                    kept Plaintiff's complaint confidential. However, upon information and belief, Mr. Hathaway's lie as to                    termination caused various students to believe the University discredited Plaintiff's allegations. This caused various teammates of Plaintiff Doe to treat Plaintiff less well than they had prior to                    termination.

49.     The retaliatory acts by                    , including spreading lies to various students about Plaintiff Doe and her complaint, continues to cause harm to Plaintiff Doe. Various members of the tennis team have ostracized her, given her dirty looks, and refused to act in a cordial manner around her. As a direct result of                    retaliatory acts, Plaintiff's ability to equally enjoy Hofstra's academic, athletic, and social activities has been severely compromised.

50.     The unlawful actions by Defendant so undermined Plaintiff's experience as a member of the tennis team that the conduct denied Plaintiff equal access to enjoy institutional opportunities.

51.     The sexual harassment that Defendant subjected Plaintiff to created a hostile environment.

52.     Defendant's unlawful actions have caused Plaintiff economic harm as well as immense emotional harm. Plaintiff has suffered from anxiety, depression, lack of sleep, and crying spells due solely to the unlawful harassment and retaliation she has been forced to endure.

9

## FIRST CAUSE OF ACTION
## HOSTILE ENVIRONMENT UNDER TITLE IX

53.    Plaintiff repeats and realleges each paragraph above.

54.    Hofstra University receives federal financial assistance within the meaning of Title

IX.

55.    Title IX states, in relevant part: "No person in the United States shall, on the basis

of sex, be excluded from participation in, be denied the benefits of, or be subjected to

discrimination under any education program or activity receiving Federal financial assistance…"

56.                      was employed by Hofstra University during the 2015-2016

academic year, until his termination in September 2016.

57.    As alleged herein,                subjected Plaintiff to unlawful sexual harassment.

58.    The sexual harassment by Mr. Menaker was severe and pervasive.

59.    As alleged herein, Hofstra knew or should have known of the sexual harassment.

60.    As alleged herein, Hofstra failed to take immediate and appropriate steps to stop

the harassment and prevent it from occurring again.

61.    As a result of Defendant's unlawful conduct, Plaintiff has suffered both economic

and emotional harm.

## SECOND CAUSE OF ACTION
## QUID PRO QUO HARASSMENT UNDER TITLE IX

62.    Plaintiff repeats and realleges each paragraph above.

63.    Title IX prohibits institutions from subjecting students to quid pro quo sexual

harassment.

64.    At all relevant times,                was employed by Hofstra.

10

65.    As alleged herein,                    subjected Plaintiff to quid pro quo sexual

harassment.

66.    As a result of Defendant's quid pro quo harassment, Plaintiff has suffered economic

and emotional harm.

### THIRD CAUSE OF ACTION
### RETALIATION UNDER TITLE IX

67.    Plaintiff repeats and realleges each paragraph above.

68.    Title IX prohibits institutions from retaliating against students who engage in

activity protected by the statute.

69.    As alleged herein, Plaintiff engaged in protected activity.

70.    As alleged herein, Defendant had knowledge of Plaintiff's protected activity.

71.    As alleged herein, Plaintiff was retaliated against because of her participation in

protected activity.

72.    As a result of Defendant's unlawful retaliation, Plaintiff has suffered adverse

institution-related actions.

73.    As a result of Defendant's unlawful conduct, Plaintiff has suffered monetary and

non-monetary damages to which she entitled to relief under the law.

### FOURTH CAUSE OF ACTION
### NEGLIGENT SUPERVISION

74.    Plaintiff repeats and realleges each paragraph above.

75.    Hofstra University and Jeffrey Menaker maintained an employer-employee

relationship during              tenure as tennis coach at Hofstra.

76.    As alleged herein, Hofstra knew or should have known of            unlawful

conduct.

11

77.     As alleged herein, Hofstra knew or should have known that          conduct

would cause harm to Plaintiff.

78.          unlawful conduct occurred during the course of, and within the

scope of, his employment with Hofstra.

79.     As a result of Defendant's negligent supervision of          Plaintiff suffered

harms including extreme emotional distress.

## FIFTH CAUSE OF ACTION
## NEGLIGENT RETENTION

80.     Plaintiff repeats and realleges each paragraph above.

81.     At all relevant times, Hofstra University and          maintained an

employer-employee relationship.

82.     As alleged herein, Hofstra was aware of          unlawful conduct.

83.     As alleged herein, Hofstra was aware that          conduct had caused, and

would continue to cause, Plaintiff harm.

84.     Hofstra retained          as an employee for an unreasonable length of time

after learning of the unlawful conduct and the harm it was causing Plaintiff.

85.          unlawful conduct occurred during the course of, and within the

scope of, his employment with Defendant.

86.     As a result of Defendant's negligent retention of          Plaintiff suffered

harms including extreme emotional distress.

## DEMAND FOR JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by

jury as to all issues triable by jury in the above-captioned civil action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests a judgment against the Defendant:

A. Declaring that the Defendant engaged in unlawful discrimination and retaliation under Title IX as well as negligent supervision and negligent retention under New York law;

B. Awarding damages to Plaintiff for all economic and non-economic injuries she has suffered as a result of Defendant's unlawful conduct;

C. Awarding Plaintiff punitive damages to punish the Defendant for its unlawful conduct;

D. Awarding Plaintiff attorney's fees, costs, and expenses incurred in the prosecution of this action;

E. Awarding Plaintiff such other and further relief as the Court may deem equitable, just, and proper to remedy the Defendant's unlawful conduct.

Dated: New York, New York
January 12, 2017

PHILLIPS & ASSOCIATES, PLLC

David S. Schwartz (DS5982)
45 Broadway, Suite 620
New York, NY 10006
Tel: (212) 248-7431
Fax: (212) 901-2107
Dschwartz@tpglaws.com

Case 2:17-cv-00561-DRH-SYS Document 1-1 Filed 02/03/17 Page 1 of 122 PageID #: 169

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Jane Doe

**DEFENDANTS**
Hofstra University

**(b)** County of Residence of First Listed Plaintiff    Nassau
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Nassau
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

CV 17 - 0179

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
David Schwartz
45 Broadway, Suite 620, New York, NY 10006
(212) 248-7431

Attorneys *(If Known)*

HURLEY, J.
SHIELDS, M.J.

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☒ 3 Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plainti and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY**    **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane    ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product      Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument |      Liability    ☐ 367 Health Care/ | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 320 Assault, Libel &      Pharmaceutical      Slander      Personal Injury | | ☐ 820 Copyrights ☐ 830 Patent | ☐ 430 Banks and Banking ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers'      Product Liability | | ☐ 840 Trademark | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) |      Liability    ☐ 368 Asbestos Personal ☐ 340 Marine      Injury Product ☐ 345 Marine Product      Liability | **LABOR** ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** ☐ 861 HIA (1395ff) ☐ 862 Black Lung (923) | ☐ 470 Racketeer Influenced and Corrupt Organizations ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits |      Liability    **PERSONAL PROPERTY** | ☐ 720 Labor/Management Relations | ☐ 863 DIWC/DIWW (405(g)) ☐ 864 SSID Title XVI | ☐ 490 Cable/Sat TV ☐ 850 Securities/Commodities/ |
| ☐ 160 Stockholders' Suits | ☐ 350 Motor Vehicle    ☐ 370 Other Fraud | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) |      Exchange |
| ☐ 190 Other Contract | ☐ 355 Motor Vehicle    ☐ 371 Truth in Lending      Product Liability | ☐ 751 Family and Medical Leave Act | | ☐ 890 Other Statutory Actions ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal    ☐ 380 Other Personal      Injury      Property Damage | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters ☐ 895 Freedom of Information |
| ☐ 196 Franchise | ☐ 362 Personal Injury -    ☐ 385 Property Damage      Medical Malpractice      Product Liability | ☐ 791 Employee Retirement Income Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |      Act ☐ 896 Arbitration |
| **REAL PROPERTY** | **CIVIL RIGHTS**    **PRISONER PETITIONS** | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights    **Habeas Corpus:** | | |      Act/Review or Appeal of |
| ☐ 220 Foreclosure | ☐ 441 Voting    ☐ 463 Alien Detainee | | |      Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment    ☐ 510 Motions to Vacate | | | ☐ 950 Constitutionality of |
| ☐ 240 Torts to Land | ☐ 443 Housing/      Sentence | | |      State Statutes |
| ☐ 245 Tort Product Liability |      Accommodations    ☐ 530 General | | | |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities -    ☐ 535 Death Penalty      Employment    **Other:** | **IMMIGRATION** | | |
| | ☐ 446 Amer. w/Disabilities -    ☐ 540 Mandamus & Other      Other    ☐ 550 Civil Rights | ☐ 462 Naturalization Application ☐ 465 Other Immigration | | |
| | ☒ 448 Education    ☐ 555 Prison Condition    ☐ 560 Civil Detainee -      Conditions of      Confinement |      Actions | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
20 U.S.C. § 1681
Brief description of cause:
Discrimination and Retaliation

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:**    ☒ Yes    ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*

JUDGE           DOCKET NUMBER

DATE        SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #      AMOUNT      APPLYING IFP      JUDGE      MAG. JUDGE

## CERTIFICATION OF ARBITRATION ELIGIBILITY

Local Arbitration Rule 83.10 provides that with certain exceptions, actions seeking money damages only in an amount not in excess of $150,000, exclusive of interest and costs, are eligible for compulsory arbitration. The amount of damages is presumed to be below the threshold amount unless a certification to the contrary is filed.

I, David S. Schwartz , counsel for Plaintiff , do hereby certify that the above captioned civil action is ineligible for compulsory arbitration for the following reason(s):

☒ monetary damages sought are in excess of $150,000, exclusive of interest and costs,

☐ the complaint seeks injunctive relief,

☐ the matter is otherwise ineligible for the following reason

### DISCLOSURE STATEMENT - FEDERAL RULES CIVIL PROCEDURE 7.1

Identify any parent corporation and any publicly held corporation that owns 10% or more or its stocks:

### RELATED CASE STATEMENT (Section VIII on the Front of this Form)

Please list all cases that are arguably related pursuant to Division of Business Rule 50.3.1 in Section VIII on the front of this form. Rule 50.3.1 (a) provides that "A civil case is "related" to another civil case for purposes of this guideline when, because of the similarity of facts and legal issues or because the cases arise from the same transactions or events, a substantial saving of judicial resources is likely to result from assigning both cases to the same judge and magistrate judge." Rule 50.3.1 (b) provides that " A civil case shall not be deemed "related" to another civil case merely because the civil case: (A) involves identical legal issues, or (B) involves the same parties." Rule 50.3.1 (c) further provides that "Presumptively, and subject to the power of a judge to determine otherwise pursuant to paragraph (d), civil cases shall not be deemed to be "related" unless both cases are still pending before the court."

### NY-E DIVISION OF BUSINESS RULE 50.1(d)(2)

1.) Is the civil action being filed in the Eastern District removed from a New York State Court located in Nassau or Suffolk County: No

2.) If you answered "no" above:
a) Did the events or omissions giving rise to the claim or claims, or a substantial part thereof, occur in Nassau or Suffolk County? Yes

b) Did the events or omissions giving rise to the claim or claims, or a substantial part thereof, occur in the Eastern District? Yes

If your answer to question 2 (b) is "No," does the defendant (or a majority of the defendants, if there is more than one) reside in Nassau or Suffolk County, or, in an interpleader action, does the claimant (or a majority of the claimants, if there is more than one) reside in Nassau or Suffolk County?
(Note: A corporation shall be considered a resident of the County in which it has the most significant contacts).

### BAR ADMISSION

I am currently admitted in the Eastern District of New York and currently a member in good standing of the bar of this court.
☒ Yes      ☐ No

Are you currently the subject of any disciplinary action (s) in this or any other state or federal court?
☐ Yes   (If yes, please explain)   ☒ No

I certify the accuracy of all information provided above.

Signature:

TO: Clerk's Office
**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

**APPLICATION FOR LEAVE**
**TO FILE DOCUMENT UNDER SEAL**

FILED
CLERK

2017 JAN 13 AM 10: 18

U.S. [...]
EAST[...]
OF[...]

*******************************************
Jane Doe

-v-

Hofstra University

CV 17 - 0179

Docket Number HURLEY, J.

SHIELDS, M.J.
*******************************************

SUBMITTED BY: Plaintiff ☑ Defendant ☐ DOJ ☐
Name: David S. Schwartz
Firm Name: Phillips & Associates, PLLC
Address: 45 Broadway, Suite 620
New York, NY 10006
Phone Number: (212) 248-7431
E-Mail Address: Dschwartz@tpglaws.com

INDICATE UPON THE PUBLIC DOCKET SHEET: YES ☑ NO ☐
If yes, state description of document to be entered on docket sheet:

Complaint

**A) If pursuant to a prior Court Order:**
Docket Number of Case in Which Entered:_____
Judge/Magistrate Judge:_____
Date Entered:_____

**B) If a new application,** the statute, regulation, or other legal basis that authorizes filing under seal

Sealed Plaintiff v. Sealed Defendant #1, 537 F.3d 185 (2d Cir. 2008)

**ORDERED SEALED AND PLACED IN THE CLERK'S OFFICE,**
**AND MAY NOT BE UNSEALED UNLESS ORDERED BY**
**THE COURT.**

DATE 1/13/17 /s/ Denis R. Hurley

**U.S. DISTRICT JUDGE/U.S. MAGISTRATE JUDGE**
RECEIVED IN CLERK'S
OFFICE_____
DATE_____

MANDATORY CERTIFICATION OF SERVICE:
A.) ☑ A copy of this application either has been or will be promptly served upon all parties to this action, B.) ☐ Service is excused by 31 U.S.C. 3730(b), or by the following other statute or regulation: ☐; or C.) ☐ This is a criminal document submitted, and flight public safety, or security are significant concerns. (Check one)

1/12/2017
**DATE**

**SIGNATURE**

# Exhibit G to Davis Declaration

**Full docket text:**

ORDER granting [3] Motion to proceed pseudonymously  The Court having considered the factors presented in Sealed Plaintiff v  Sealed Defendant, 537 F 3d 185 (2d Cir  2008), finds that the plaintiff's interest in proceeding pseudonymously outweighs the public's interest in disclosure and any prejudice to the defendant  Specifically, given that the litigation involves matters of a personal nature and that identification by name poses a risk of harm to the plaintiff, and given that the parties consent, the Court grants the plaintiff's motion to proceed pseudonymously  The clerk of the Court is directed to unseal any remaining sealed docket entries  Ordered by Judge Denis R  Hurley on 4/6/2017  (Kaley, Regina)

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 10/19/2017 16:26:59 | | |
| **PACER Login:** | mhlaw1040:2596892 0 | **Client Code:** | 8888/24 |
| **Description:** | History/Documents | **Search Criteria:** | |
| **Billable Pages:** | 3 | **Cost:** | 0 30 |

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

------------------------------------------------------------------X    **Case No.**

JANE DOE,

                                            Plaintiff,          CV 17 - 0179

                  - against -

HOFSTRA UNIVERSITY,                                             HURLEY, J.

                                            Defendant.         SHIELDS, M.J.
------------------------------------------------------------------X

## NOTICE OF MOTION REQUESTING LEAVE FOR PLAINTIFF TO PROCEED PSEUDONYMOUSLY OR, IN THE ALTERNATIVE, TO PROCEED UNDER SEAL

**PLEASE TAKE NOTICE THAT** upon the annexed Memorandum of Law, Plaintiff will

move this Court at the United States Courthouse for the Eastern District of New York, 100 Federal

Plaza, Central Islip, New York 11722, in front a Judge to be assigned, at a time to be decided, for

an Order granting Plaintiff leave to proceed pseudonymously or, in the alternative, for an Order

sealing the Complaint.


Dated: New York, New York
       January 12, 2017


                                            Respectfully Submitted,



                                            _____
                                            David S. Schwartz, Esq. (DS5982)
                                            Phillips & Associates, PLLC
                                            45 Broadway, Suite 620
                                            New York, NY 10006
                                            Tel: (212) 248-7431
                                            Fax: (212) 901-2107
                                            Dschwartz@tpglaws.com

2017 JAN 13 AM 10: 18

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

----------------------------------------------------------------X

JANE DOE,

                        Plaintiff,

        - against -

HOFSTRA UNIVERSITY,

                 Defendant.

----------------------------------------------------------------X

**Case No.** 2017 JAN 13 AM 10: 18

CV 17 - 0179

**HURLEY, J.**

**SHIELDS, M.J.**

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION REQUESTING LEAVE FOR PLAINTIFF TO PROCEED PSEUDONYMOUSLY OR, IN THE ALTERNATIVE, FOR AN ORDER SEALING THE COMPLAINT

Plaintiff, proceeding pseudonymously as Jane Doe, through her attorneys, Phillips & Associates, PLLC, respectfully submits the below Memorandum of Law in support of Plaintiff's Motion requesting leave to file her Complaint and proceed in litigation pseudonymously or, in the alternative, for an order sealing the Complaint.

### A. Legal Framework Governing Motions to Proceed Pseudonymously.

Fed. R. Civ. Pro. 10(a) requires that the title of a complaint name all parties. However, courts have approved of plaintiffs litigating under a pseudonym in certain circumstances. See *Sealed Plaintiff v. Sealed Defendant #1*, 537 F.3d 185, 189 (2d Cir. N.Y. 2008). When determining whether a plaintiff should be permitted to proceed pseudonymously, courts must balance the plaintiff's interest in anonymity against both the public interest in disclosure and any prejudice to the defendant. *Id.* The Court in *Sealed Plaintiff* gives a non-exhaustive list of ten factors to consider when determining whether to allow a plaintiff to proceed pseudonymously, which include:

1

"(1) whether the litigation involves matters that are "highly sensitive and [of a] personal nature,"; (2) "whether identification poses a risk of retaliatory physical or mental harm to the . . . party [seeking to proceed anonymously] or even more critically, to innocent non-parties,"; (3) whether identification presents other harms and the likely severity of those harms, including whether "the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity,""; (4) whether the plaintiff is particularly vulnerable to the possible harms of disclosure, particularly in light of his age; (5) whether the suit is challenging the actions of the government or that of private parties; (6) whether the defendant is prejudiced by allowing the plaintiff to press his claims anonymously, whether the nature of that prejudice (if any) differs at any particular stage of the litigation, and whether any prejudice can be mitigated by the district court; (7) whether the plaintiff's identity has thus far been kept confidential; (8) whether the public's interest in the litigation is furthered by requiring the plaintiff to disclose his identity; (9) whether, because of the purely legal nature of the issues presented or otherwise, there is an atypically weak public interest in knowing the litigants' identities; and (10) whether there are any alternative mechanisms for protecting the confidentiality of the plaintiff."

*Id* at 189-190 (internal citations omitted).

### B. Material Facts Relevant to Plaintiff's Motion.

An analysis of the factual allegations in the case at bar supports Plaintiff's request to proceed pseudonymously. The Plaintiff in this case, a student-athlete at Hofstra University, was sexually harassed by her male tennis coach, , over a period of several months. See generally Plaintiff's Complaint ("Compl."). This harassment caused Plaintiff mental anguish, as well as humiliation and embarrassment. When Plaintiff rejected these sexual advances, her harasser retaliated against her by threatening to revoke her scholarship, sabotaging her request to transfer schools, and threatening to remove her from the tennis team. Compl. ¶¶ 27-35.

When the Plaintiff complained of this conduct to officials at Hofstra, Mr. Menaker subjected Plaintiff to further retaliation. Part of this retaliation came in the form of Mr. Menaker telling other students about Plaintiff's complaint as well as calling the Plaintiff a liar, in addition to making various other derogatory comments about Plaintiff. Compl. ¶¶ 38-41.

2

As soon as _____ began to speak with other students about Plaintiff's complaint, many of these students began to change the way they interacted with Plaintiff. Plaintiff was ostracized and subjected to derogatory remarks by her peers. Compl. ¶¶ 42, 46-48.

The effects of _____ retaliatory conduct towards Plaintiff worsened after the University eventually terminated him. Various members of the men's tennis team, which Mr. Menaker also coached, acted with outright hostility towards Plaintiff, giving her menacing looks and refusing to have even basic interactions with her during coed practices. Compl. ¶ 47. These male tennis students also began to echo _____ derogatory comments to other students both on and off the tennis team. This conduct led Plaintiff to fear for her physical well-being.

## C. The *Sealed Plaintiff* Factors Support Plaintiff's Motion to Proceed Pseudonymously.

With regard to the first *Sealed Plaintiff* factor, the matters at issue in this case include allegations of sexual harassment and retaliation, which are of a highly sensitive and personal nature. Courts have allowed plaintiffs to proceed anonymously in cases concerning a wide range intimate issues such as sexual assault, abortion, status as an AIDS patient, and sexual orientation. See *Doe No. 2 v. Kolko*, 242 F.R.D. 193, 196 (E.D.N.Y. 2006) (listing cases). Courts have also allowed Title IX plaintiffs to proceed anonymously in cases involving students challenging their college's handling of sexual assault allegations. See *Doe v. Colgate Univ.*, 2016 U.S. Dist. LEXIS 48787 (N.D.N.Y Apr. 12, 2016). Plaintiff's allegations here of sexual harassment and retaliation are in line with the type of intimate issues in which courts have allowed pseudonymous plaintiffs.

Secondly, there is a risk to the Plaintiff of further mental harm and even physical harm if she is forced to proceed under her own name. The students to whom _____ told of Plaintiff's complaint subjected Plaintiff to hostile encounters in order to show their displeasure with Plaintiff's actions. This conduct by other students has caused Plaintiff immense emotional

suffering. The conduct has severely diminished her ability to enjoy the college experience in the same way as a student who had not been subjected to sexual harassment would be able to. Plaintiff's fears of additional ostracization and retaliation by members of Plaintiff's collegiate community are sufficient to warrant allowing her to proceed pseudonymously. See e.g. *Kolko*, 242 F.R.D. at 197 (fear of ostracization and retaliation from within religious community in response to the filing of a lawsuit warranted allowing plaintiff to proceed anonymously.)

Courts in other Circuits have ruled that the danger of retaliation from a person or people learning that the plaintiff has initiated a judicial proceeding is "often a compelling ground for allowing a party to proceed anonymously. *Doe v. City of Chicago*, 360 F.3d 667, 669 (7th Cir. Ill. 2004) (citations omitted); citing to *Doe v. Stegall*, 653 F.2d 180, 186 (5th Cir. Miss. 1981); see also *Doe v. Rector & Visitors of George Mason Univ.*, 179 F. Supp. 3d 583, 594 (E.D. Va. 2016).

The third factor in *Sealed Plaintiff*, that identification of the plaintiff would lead to the injury that is being litigated against, weighs strongly in favor of allowing Plaintiff here to proceed pseudonymously. Plaintiff's claims of retaliation stem from               seeking to maliciously harm Plaintiff's ability to enjoy her collegiate experience by spreading lies and derogatory statements about her to other students. A complaint by Plaintiff to the University which should have been kept confidential has caused her immense harm even in the limited exposure it has so far gotten. Identifying Plaintiff by name in this case opens up the very real possibility that she might suffer additional harm from various other students who may be upset that she made a complaint.

The fourth factor, which concerns the age of the plaintiff, also weighs in favor of allowing Plaintiff a pseudonym. Plaintiff was eighteen years old at the time the harassment began, and is only nineteen years old as of the date of this filing.

4

The Defendant in this case is also unlikely to suffer the type of prejudice that would disfavor allowing Plaintiff to proceed anonymously. See *Doe v. De Amigos*, LLC, 2012 U.S. Dist. LEXIS 190501, *7 (D.D.C. Apr. 30, 2012) ("Defendant [in civil sexual assault case] challenging plaintiff's motion is not the alleged attacker, but the venue that allegedly served her alcohol. Thus, the stigma that the courts feared would attach to the defendants in those cases is not of particular concern here.") Plaintiff here is suing the institution that allowed the harassment and retaliation to exist, not the individual harasser himself. Therefore, Defendant would not be prejudiced by Plaintiff proceeding pseudonymously. There is only one plaintiff in this case, and the Defendant is aware of her identity. Allowing Plaintiff to proceed under a pseudonym will not inhibit Defendant's ability to litigate this case. See *Doe v. Colgate Univ.*, 2016 U.S. Dist. LEXIS 48787, *10 (N.D.N.Y Apr. 12, 2016); citing *Kolko*, 242 F.R.D. at 198 ("Other than the need to make redactions and take measures not to disclose plaintiff's identity, defendants will not be hampered or inconvenienced merely by Plaintiff's anonymity in court papers.")

There is also a public interest in allowing Plaintiff to proceed anonymously, as requiring Plaintiff to proceed in this case under her actual name may deter others from reporting similar harassment. See e.g. *Kolko*, 242 F.R.D. at 195. Disallowing young college students from vindicating their Title IX rights without fear of the unfortunate publicity that often accompanies filing cases of this nature would chill the anti-discrimination goals of the statute.

With regard to the ninth *Sealed Plaintiff* factor, the claims in this case rest more heavily on legal questions than factual ones, thus weakening the public's interest in knowing the Plaintiff's identity. At this early stage, the Court could infer that Hofstra's decision to terminate was done because Hofstra found Plaintiff's allegations against      to be truthful. The

5

questions therefore presented in this case are legal issues regarding whether Defendant is liable to Plaintiff under Title IX based on Plaintiff's allegations.

## D. Conclusion

For the reasons stated above, Plaintiff respectfully requests that this Court allow her to proceed pseudonymously in this case or, in the alternative, for an Order sealing Plaintiff's Complaint.

Dated: New York, NY
January 12, 2017

Respectfully Submitted,

David S. Schwartz, Esq. (DS5982)
Phillips & Associates, PLLC
45 Broadway, Suite 620
New York, NY 10006
Tel: (212) 248-7431
Fax: (212) 901-2107
Dschwartz@tpglaws.com

6

**TO: Clerk's Office**
   **UNITED STATES DISTRICT COURT**
   **EASTERN DISTRICT OF NEW YORK**

**APPLICATION FOR LEAVE**
**TO FILE DOCUMENT UNDER SEAL**

FILED
CLERK

· 2017 JAN 13  AM 10: 18

U.S. ...
EASTE...
OF ...

*****************************************

Jane Doe      **CV 17 -   0179**
   -v-

Hofstra University  Docket Number

HURLEY, J.

SHIELDS, M.J.

*****************************************

SUBMITTED BY: Plaintiff ✓ Defendant ☐ DOJ ☐
Name: David S. Schwartz
Firm Name: Phillips & Associates, PLLC
Address: 45 Broadway, Suite 620
   New York, NY 10006
Phone Number: (212) 248-7431
E-Mail Address: Dschwartz@tpglaws.com

INDICATE UPON THE PUBLIC DOCKET SHEET: YES ✓ NO ☐
If yes, state description of document to be entered on docket sheet:

Complaint

A) If pursuant to a prior Court Order:
   Docket Number of Case in Which Entered:_____
   Judge/Magistrate Judge:_____
   Date Entered:_____

B) If a **new** application, the statute, regulation, or other legal basis that
authorizes filing under seal

Sealed Plaintiff v. Sealed Defendant #1, 537 F.3d 185 (2d Cir. 2008)

**ORDERED SEALED AND PLACED IN THE CLERK'S OFFICE,**
**AND MAY NOT BE UNSEALED UNLESS ORDERED BY**
THE COURT.

DATE 1/13/17  /s/ Denis R. Hurley k

**U.S. DISTRICT JUDGE/U.S. MAGISTRATE JUDGE**
         RECEIVED IN CLERK'S
OFFICE_____
                                    DATE

**MANDATORY CERTIFICATION OF SERVICE:**
A.) ✓ A copy of this application either has been or will be promptly served upon all parties to this action, **B.)** ☐ Service is excused by 31 U.S.C. 3730(b), or by
the following other statute or regulation:____; or **C.)** ☐ This is a criminal document submitted, and flight public safety, or security are significant concerns.
(Check one)

1/12/2017
   **DATE**                              **SIGNATURE**

# Exhibit H to Davis Declaration

JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| A.B. | C.D. |

| (b) County of Residence of First Listed Plaintiff Queens | County of Residence of First Listed Defendant Ontario, CAN |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)*<br>NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF<br>THE TRACT OF LAND INVOLVED. |

| (c) Attorneys *(Firm Name, Address, and Telephone Number)* | Attorneys *(If Known)* |
|---|---|
| Menaker & Herrmann LLP<br>10 East 40th Street, 25th Floor, New York, NY 10016<br>(212) 545-1900 | Phillips & Associates, PLLC<br>45 Broadway, Suite 620, New York, NY 10006<br>(212) 248-7431 |

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

❏ 1 U.S. Government Plaintiff

❏ 3 Federal Question *(U.S. Government Not a Party)*

☒ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

❏ 2 U.S. Government Defendant

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ❏ 1 | Incorporated *or* Principal Place of Business In This State | ❏ 4 | ❏ 4 |
| Citizen of Another State | ❏ 2 | ❏ 2 | Incorporated *and* Principal Place of Business In Another State | ❏ 5 | ❏ 5 |
| Citizen or Subject of a Foreign Country | ❏ 3 | ☒ 3 | Foreign Nation | ❏ 6 | ❏ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ❏ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ❏ 625 Drug Related Seizure of Property 21 USC 881 | ❏ 422 Appeal 28 USC 158 | ❏ 375 False Claims Act |
| ❏ 120 Marine | ❏ 310 Airplane | ❏ 365 Personal Injury - | ❏ 690 Other | ❏ 423 Withdrawal 28 USC 157 | ❏ 376 Qui Tam (31 USC 3729(a)) |
| ❏ 130 Miller Act | ❏ 315 Airplane Product Liability | Product Liability | | | ❏ 400 State Reapportionment |
| ❏ 140 Negotiable Instrument | | ❏ 367 Health Care/ | | **PROPERTY RIGHTS** | ❏ 410 Antitrust |
| ❏ 150 Recovery of Overpayment & Enforcement of Judgment | ☒ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | ❏ 820 Copyrights | ❏ 430 Banks and Banking |
| ❏ 151 Medicare Act | ❏ 330 Federal Employers' Liability | Product Liability | | ❏ 830 Patent | ❏ 450 Commerce |
| ❏ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ❏ 340 Marine | ❏ 368 Asbestos Personal Injury Product Liability | | ❏ 835 Patent - Abbreviated New Drug Application | ❏ 460 Deportation |
| | ❏ 345 Marine Product Liability | | **LABOR** | ❏ 840 Trademark | ❏ 470 Racketeer Influenced and Corrupt Organizations |
| ❏ 153 Recovery of Overpayment of Veteran's Benefits | ❏ 350 Motor Vehicle | **PERSONAL PROPERTY** | ❏ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ❏ 480 Consumer Credit |
| ❏ 160 Stockholders' Suits | ❏ 355 Motor Vehicle Product Liability | ❏ 370 Other Fraud | ❏ 720 Labor/Management Relations | ❏ 861 HIA (1395ff) | ❏ 490 Cable/Sat TV |
| ❏ 190 Other Contract | ❏ 360 Other Personal Injury | ❏ 371 Truth in Lending | | ❏ 862 Black Lung (923) | ❏ 850 Securities/Commodities/ Exchange |
| ❏ 195 Contract Product Liability | ❏ 362 Personal Injury - Medical Malpractice | ❏ 380 Other Personal Property Damage | ❏ 740 Railway Labor Act | ❏ 863 DIWC/DIWW (405(g)) | ❏ 890 Other Statutory Actions |
| ❏ 196 Franchise | | ❏ 385 Property Damage Product Liability | ❏ 751 Family and Medical Leave Act | ❏ 864 SSID Title XVI | ❏ 891 Agricultural Acts |
| | | | ❏ 790 Other Labor Litigation | ❏ 865 RSI (405(g)) | ❏ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ❏ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ❏ 895 Freedom of Information Act |
| ❏ 210 Land Condemnation | ❏ 440 Other Civil Rights | **Habeas Corpus:** | | ❏ 870 Taxes (U.S. Plaintiff or Defendant) | ❏ 896 Arbitration |
| ❏ 220 Foreclosure | ❏ 441 Voting | ❏ 463 Alien Detainee | | ❏ 871 IRS—Third Party 26 USC 7609 | ❏ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ❏ 230 Rent Lease & Ejectment | ❏ 442 Employment | ❏ 510 Motions to Vacate Sentence | | | |
| ❏ 240 Torts to Land | ❏ 443 Housing/ Accommodations | ❏ 530 General | | | ❏ 950 Constitutionality of State Statutes |
| ❏ 245 Tort Product Liability | ❏ 445 Amer. w/Disabilities - Employment | ❏ 535 Death Penalty | **IMMIGRATION** | | |
| ❏ 290 All Other Real Property | ❏ 446 Amer. w/Disabilities - Other | **Other:** | ❏ 462 Naturalization Application | | |
| | ❏ 448 Education | ❏ 540 Mandamus & Other | ❏ 465 Other Immigration Actions | | |
| | | ❏ 550 Civil Rights | | | |
| | | ❏ 555 Prison Condition | | | |
| | | ❏ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

❏ 1 Original Proceeding

☒ 2 Removed from State Court

❏ 3 Remanded from Appellate Court

❏ 4 Reinstated or Reopened

❏ 5 Transferred from Another District *(specify)*

❏ 6 Multidistrict Litigation - Transfer

❏ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Removal - 28 U.S.C. 1441

Brief description of cause:

## VII. REQUESTED IN COMPLAINT:

❏ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:

JURY DEMAND: ❏ Yes ❏ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE Denis R. Hurley

DOCKET NUMBER 17-CV-0179

DATE
10/05/2017

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

## CERTIFICATION OF ARBITRATION ELIGIBILITY

Local Arbitration Rule 83.10 provides that with certain exceptions, actions seeking money damages only in an amount not in excess of $150,000, exclusive of interest and costs, are eligible for compulsory arbitration. The amount of damages is presumed to be below the threshold amount unless a certification to the contrary is filed.

I, _David Schwartz_____, counsel for _Defendant_____, do hereby certify that the above captioned civil action is ineligible for compulsory arbitration for the following reason(s):

☒     monetary damages sought are in excess of $150,000, exclusive of interest and costs,

☐     the complaint seeks injunctive relief,

☐     the matter is otherwise ineligible for the following reason

### DISCLOSURE STATEMENT - FEDERAL RULES CIVIL PROCEDURE 7.1

Identify any parent corporation and any publicly held corporation that owns 10% or more or its stocks:

### RELATED CASE STATEMENT (Section VIII on the Front of this Form)

Please list all cases that are arguably related pursuant to Division of Business Rule 50.3.1 in Section VIII on the front of this form. Rule 50.3.1 (a) provides that "A civil case is "related" to another civil case for purposes of this guideline when, because of the similarity of facts and legal issues or because the cases arise from the same transactions or events, a substantial saving of judicial resources is likely to result from assigning both cases to the same judge and magistrate judge." Rule 50.3.1 (b) provides that " A civil case shall not be deemed "related" to another civil case merely because the civil case: (A) involves identical legal issues, or (B) involves the same parties." Rule 50.3.1 (c) further provides that "Presumptively, and subject to the power of a judge to determine otherwise pursuant to paragraph (d), civil cases shall not be deemed to be "related" unless both cases are still pending before the court."

### NY-E DIVISION OF BUSINESS RULE 50.1(d)(2)

1.)     Is the civil action being filed in the Eastern District removed from a New York State Court located in Nassau or Suffolk County? _No_____

2.)     If you answered "no" above:
a) Did the events or omissions giving rise to the claim or claims, or a substantial part thereof, occur in Nassau or Suffolk County? _Yes_____

b) Did the events or omissions giving rise to the claim or claims, or a substantial part thereof, occur in the Eastern District? _Yes_____

If your answer to question 2 (b) is "No," does the defendant (or a majority of the defendants, if there is more than one) reside in Nassau or Suffolk County, or, in an interpleader action, does the claimant (or a majority of the claimants, if there is more than one) reside in Nassau or Suffolk County?_____
       (Note: A corporation shall be considered a resident of the County in which it has the most significant contacts).

### BAR ADMISSION

I am currently admitted in the Eastern District of New York and currently a member in good standing of the bar of this court.
     ☒    Yes               ☐    No

Are you currently the subject of any disciplinary action (s) in this or any other state or federal court?
     ☐    Yes    (If yes, please explain)    ☒    No

I certify the accuracy of all information provided above.

**Signature:**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

A.B.,                                                         :     Case No. 2:17-cv-05840-JS-GRB
                                                              :
                                         Plaintiff,           :
                                                              :
                      -against-                               :
                                                              :
C.D.,                                                         :
                                                              :
                                         Defendant.           :
                                                              :
-------------------------------------------------------------------X


**PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION
TO CONSOLIDATE AND TO SEAL RECORD OR, IN THE
ALTERNATIVE, TO CONTINUE USE OF PARTY PSEUDONYMS**


MENAKER & HERRMANN LLP
*Attorneys for Plaintiff*
10 East 40th Street
New York, New York 10016
(212) 545-1900


October 20, 2017

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

A.B.,                                                    :   Case No. 2:17-cv-05840-JS-GRB
                                                         :
                                      Plaintiff,         :
                                                         :
              -against-                                  :
                                                         :
C.D.,                                                    :
                                                         :
                                      Defendant.         :
                                                         :
-------------------------------------------------------------------X

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION TO CONSOLIDATE AND TO SEAL RECORD OR, IN THE <u>ALTERNATIVE, TO CONTINUE USE OF PARTY PSEUDONYMS</u>

Plaintiff moves for an order (a) consolidating this removed action with two related actions pending in this Court, and (b) sealing the record or, in the alternative, authorizing continued use of party pseudonyms in the interest of justice.

This is an action for per se defamation by defendant, a college student/athlete ("C.D.") who accused the coach of gender-based discrimination and harassment. The student used these charges to demand increased athletic scholarship funds from Department of Athletics at Hofstra University ("Hofstra"). The charges were then used by Hofstra to terminate the coach (who is the plaintiff in this defamation action against the student). Those charges were knowing falsehoods, maliciously made for financial gain. And Hofstra's reliance on the charges was improper because, inter alia, its published procedures to determine the truth were not followed, one of several indicia of gender-based bias.

Plaintiff also moves for an order sealing the record, or in the alternative, permitting the case to proceed with the party pseudonyms used in the state court. There are strong reasons for such an order. C.D.'s father, a former state-sponsored Russian athlete, has

already personally threatened plaintiff as part of a scheme to extract a scholarship for his daughter. Moreover, certain of Defendant's falsehoods relate to plaintiff's supposed statements and grotesque remarks about women's bodily functions. Plaintiff has a wife and step-daughter who should be spared public reference to these utterly false, scandalous accusations, which are major elements of the defamation at issue. Significantly, C.D. has already obtained an order in her own action against Hofstra (pending before Judge Hurley) granting her permission for to proceed under a pseudonym. The state court complaint in this action uses pseudonyms for both plaintiff and defendant, so the concerns of each party are met.

Consolidation with two pending related cases under FCRP 42(a) is warranted. Plaintiff recently commenced an action for gender discrimination against Hofstra based on the wrongful dismissal of plaintiff due to C.D.'s false allegations. The case was commenced in state court and was recently removed to the Eastern District of New York. The case (*A.B. v. Hofstra University*, 2:2017-cv-05562, the "Dismissal case") is pending before Judge Feuerstein. In addition, Defendant has sued Hofstra in the Eastern District of New York for Title IX discrimination, naming plaintiff as a non-party. That case (*C.D. v. Hofstra University*, 2:17-cv-00179, the "C.D. case") is pending before Judge Hurley.

## FACTUAL BACKGROUND

The facts are as set out in the complaint, which is attached to the accompanying declaration of Cheryl L. Davis, dated October 20, 2017.

Defendant approached plaintiff in the parking lot near the Hofstra tennis courts in late April 2016 and asked whether her 45% athletic scholarship would be increased to a full scholarship in the coming academic year.  When plaintiff could not assist her in achieving this goal, C.D.'s father called plaintiff from Canada and personally threatened him. C.D. and her parents subsequently engaged an attorney, who sent a letter to the college falsely accusing

plaintiff of engaging in <u>quid pro quo</u> sexual harassment, *i.e.*, requiring that she engage in sexual relations in exchange for an increased scholarship, and other extreme, lurid charges. The letter sought financial benefits for C.D. and implied that plaintiff should be fired, as conditions to Defendant's not pursuing her charges in court. The charges are untrue.

The college did not complete a formal investigation of C.D.'s charges before terminating plaintiff's employment and, contrary to its published policies, did not issue an investigation report to which plaintiff could respond. The complaint alleges that plaintiff's termination was part of a settlement between defendant and the college; discovery is needed to determine the specific terms of any such settlement. Hofstra's decision makers, all women, did not properly investigate the claim and failed even to follow Hofstra's basic procedures for dealing with harassment accusations. Instead, they accepted at face value the false assertions of the tennis player because she is female, and directed the Athletics Department to terminate plaintiff's employment because of his gender (male).

## ARGUMENT

Plaintiff thereafter timely brought a Charge of Discrimination before the U.S. Equal Employment Opportunities Commission ("E.E.O.C.") alleging sex discrimination by Hofstra under Title VII of the Civil Rights Act, 42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117, 42 U.S.C. 2000ff-6. The E.E.O.C. issued a Right to Sue Letter on May 30, 2017. Meanwhile, plaintiff brought the present action against C.D., the student who had defamed him. Plaintiff made a preliminary request in the Eastern District for permission to use pseudonyms, which was denied. He then filed in New York State Supreme Court, Queens County, where anonymous treatment is permitted upon filing. Defendant removed the action to this Court. Plaintiff brought a separate action against Hofstra, the Dismissal case, in Queens

County after he received his Right to Sue Letter. Hofstra also removed that action. The Hofstra removal notice included a reference to a third action involving the same set of facts. Plaintiff's investigation of this disclosed that, unknown to him, Defendant had previously brought her own action against Hofstra – the C.D. case – back in January 2017. Judge Hurley, to whom that case was assigned, had granted her motion to proceed under the pseudonym "C.D." (Davis Decl. Ex. G).

In view of the pendency of these three cases before three judges of the same Court, plaintiff now moves to consolidate.

## I.      Consolidation is Warranted.

This Court has inherent authority to order consolidation under FCRP 42(a). "The power to order consolidation prior to trial falls within the broad inherent authority of every court 'to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel and for litigants.'"  *MacAlister v. Guterma*, 263 F.2d 65, 68 (2d Cir. 1958), *citing* Cardozo, J. in *Landis v. North American Co.,* 1936, 299 U.S. 248, 254. *See also Maggio v. Leeward Ventures, Ltd.,* 939 F.Supp. 1020 (E.D.N.Y. 1996).

The test of whether cases ought to be consolidated turns "essentially on whether the common fact and law issues indicate that there would be a sufficient saving of time and effort on the part of the court and the parties to warrant a joint trial, when balanced against the inconvenience, delay or expense to the parties that might result from requiring each to attend trial of some issues in which it is not involved." *Stein, Hall & Co. v. Scindia Steam Nav. Co.,* 264 F. Supp. 499, 501 (S.D.N.Y. 1967)

Consolidation of this action with the other two actions involving the same facts would promote judicial economy and convenience. Each party is represented by the same attorneys. Each will involve the same discovery from the same parties. A single deposition of

each party and other witnesses will suffice for all three cases. Judicial time and expense will be cut as will the same for the parties. "[P]iecemeal litigation is not to be favored since it may add to the burden not only of litigants but also of the courts." *Air King Prod. Co. v. Hazeltine Research*, 10 F.R.D. 381, 383 (E.D.N.Y. 1950).

No factors mitigate against consolidation here. "[A] court must balance the interest of judicial convenience against the potential for delay, confusion and prejudice that may result from such consolidation." *Bank of Montreal v. Eagle Assocs.*, 117 F.R.D. 530, 532 (S.D.N.Y. 1987). Rather, each factor supports consolidation:

(a)     The potential for delay here is minimal or inexistent. This case and the Dismissal case were recently removed from state court and are at an early stage.[1] No discovery has been exchanged or requested, and no preliminary or status conferences have been held in those cases. The C.D. case has a short docket of thirteen entries, covering merely the complaint, answer, and a motion to seal, which was granted.

(b)     There is no likelihood of confusion if the cases are consolidated. In fact, consolidation would eliminate the risk for confusion since separate cases could produce contradictory and confusing results. "One of the primary objectives of consolidation is to prevent separate actions for producing conflicting results." *Bank of Montreal v. Eagle Associates*, S.D.N.Y.1987, 117 F.R.D. 530.

(c)     There is no prejudice to any party. All cases are in the same district, causing no party or witness any additional travel expense.

* * *

---

[1] Removed cases can be consolidated like any other case in federal court. *B. B. Weit Printing Co. v. Frances Denney, Inc.*, 300 F.Supp. 405 (S.D.N.Y.1969).

It should be noted that plaintiff is filing a similar motion in the Dismissal case requesting consolidation and the continued use of pseudonyms to identify the parties; a copy of the letter motion therein (per court rules) is attached to the Davis Declaration as Ex. D. It may be appropriate to consolidate the two removed cases with the C.D. case since the C.D. case was filed first.

## II.     The Court Should Direct That the Record Be Sealed or That the Use of Pseudonyms Be Continued.

Judge Hurley has already granted permission to the plaintiff in the C.D. Case to proceed pseudonymously (David Decl. Ex. G), and plaintiff in this case proceeded anonymously when filing his action in Queens County. The case should be accorded the same treatment in this Court.

F.R.C.P. 10(a) states that "[t]he title of [a] complaint must name all the parties," but "[c]ourts have nevertheless 'carved out a limited number of exceptions to the general requirement of disclosure [of the names of parties] which permit plaintiffs to proceed anonymously.'" *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 189 (2d Cir. 2008) (internal citation omitted). These exceptions include conditions such as the ones faced here, where plaintiff fears physical or mental retaliation as a consequence of asserting a substantive legal right (here the right to sue for defamation), where publicizing plaintiff's name will exacerbate the harm plaintiff has already suffered, and where innocent nonparties (such as plaintiff's wife and stepchildren) would be harmed.

The Second Circuit in *Sealed Plaintiff* set out factors for a balancing test, the majority of which weigh in favor of allowing plaintiff to proceed anonymously. *Id.* at 190. A plaintiff's interest in anonymity must be weighed against "both the public interest in disclosure and any prejudice to the defendant." *Id.* at 189; see also *John Doe v. Columbia Univ.*, 831 F.3d

46 (2d Cir. 2016) (plaintiff brought suit against university for violation of Title IX by demonstrating sex bias against him in the way in which it investigated a claim of alleged sexual assault); *Doe v. Univ. of Conn.*, 2013 WL 4504299 (D. Conn. Aug. 22, 2013) (permitting both plaintiff and defendant to proceed anonymously in a case alleging sexual harassment); *Doe v. Colgate Univ.*, 2016 WL 1448829 at \*2-3 (N.D.N.Y.) "[T]he Court finds that protecting the anonymity of sexual assault victims *and those accused of committing sexual assault* can be an important safeguard to ensure that the due process rights of all parties are protected… Should Plaintiff prevail in proving that the charges against him were unfounded and the procedures Defendants followed in their investigation were unfair, forcing Plaintiff to reveal his identity would further exacerbate the emotional and reputational injuries he alleges." (emphasis added).

Here, plaintiff has a significant interest in being allowed to proceed anonymously since harm to his reputation from Defendant's false statements would be magnified if made even more broadly public. In addition, he has a well-founded fear of retaliation from defendant's father, who has previously threatened plaintiff (Compl. ¶11). Plaintiff's claim includes important legal issues that do not require that the parties' identities be public knowledge, while the fact issues have no public import. Since defendant knows plaintiff's identity, her ability to take discovery will remain unimpaired. Defendant has falsely claimed that plaintiff made inappropriate statements about his marital status and grotesque remarks about female body functions. Publicizing these statements could cause harm to plaintiff's spouse and stepchildren. *See, e.g., Sealed Plaintiff* at 190; *Smith v. Edwards*, 175 F.3d 99, 99 n. 1 (2d Cir 1999) ("For the sake of the privacy of plaintiff's child, pseudonyms for plaintiff and his family are employed throughout this opinion.").

## **CONCLUSION**

For the reasons set forth above, plaintiff's motion for an order (a) consolidating this action with the other related actions and (b) sealing the record or, in the alternative, permitting the continued use of pseudonyms should be granted.

Dated:   New York, New York
         October 20, 2017

                                    Respectfully submitted,

                                    MENAKER & HERRMANN LLP

                                    By: _____
                                         Cheryl L. Davis

                                    Attorneys for Plaintiff
                                    10 East 40th Street
                                    New York, New York 10016
                                    (212) 545-1900